1  Caleb Marker (CA SBN 269721)
2  **ZIMMERMAN REED LLP**
   2381 Rosecrans Avenue, Suite 328
3  Manhattan Beach, CA 90245
   Telephone: (877) 500-8780
4  Facsimile: (480) 500-8781
   Email: caleb.marker@zimmreed.com

5

6  *Attorneys for Plaintiffs and the Class*

7  *(Additional Counsel listed below)*

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10 | JAMES ZIMMER, MELVIN RICH, | Case No. ___2:17-cv-06913___
   | ERNIE ARNOLD, SANDRA
11 | GREENE, JAMES MITCHELL, KURT
   | SHOEMAKER, SR., RANDALL
12 | ORTEGO, STEVEN HORNER, SR., | **CLASS ACTION COMPLAINT**
   | JAMES JACKSON, DEBRA SADLER,
13 | AND RICHARD HAISCH, | **DEMAND FOR JURY TRIAL**
   | individually and as representative of a
14 | class of similarly situated persons,

15 |                          Plaintiffs,
   | -v-
16 |
   | DOMETIC CORPORATION, a
17 | Delaware Corporation,

18 |                          Defendant.

19

20

21

22

23

24

25

26

27

28

---

Plaintiffs James Zimmer, Melvin Rich, Ernie Arnold, Sandra Greene, Ph.D., James Mitchell, Kurt Shoemaker, Sr., Randall Ortego, Steven Horner, Sr., James Jackson, Debra Sadler, and Richard Haisch (collectively "Plaintiffs"), individually and as the representatives of a Class of similarly situated persons, through the undersigned counsel, allege as follows:

## I.     INTRODUCTION

1.     This class action challenges the deceptive, misleading, unfair, and unlawful business practices of Defendant Dometic Corporation (referred to herein as "Defendant" or "Dometic") in connection with its active concealment and failure to disclose a dangerous safety defect inherent in gas absorption refrigerators designed, manufactured, marketed, and sold by Defendant to Plaintiffs and members of the Class for use in recreational vehicles and boats (collectively referred to herein as "recreational vehicles" or "RV's").

2.     Since at least 2001, Defendant has designed, manufactured, sold, distributed, and/or otherwise placed into the stream of commerce at least ten models of defective gas absorption refrigerators (the "Defective Gas Absorption Refrigerators") that share common cooling units (the "Defective Cooling Units") for installation and use in RV's throughout the United States, including this state. Each refrigerator model at issue herein contains a materially identical cooling unit which shares a common, latent design and manufacturing defect that is inherent at the point of sale but unknown to Class members and could not have been reasonably discovered thorough inspection before they purchased it.

3.     Specifically, the Defective Cooling Units are designed such that boiler tubes are prone to premature corrosion and stress fatigue and develop microscopic cracks, causing noxious and flammable chemicals and gases (hydrogen and ammonia) inside the sealed boiler tubes to leak. This creates both a serious risk of fire due to the cooling unit's proximity to competent ignition sources, and exposure to other bodily harm from inhalation of the noxious cooling

unit solution.   Moreover, because the cooling unit is a self-contained, highly pressurized system, a leak destroys the entire unit, which must then be replaced at significant cost even if a fire does not result, though a consumer can replace the Defective Cooling Unit without compromising the refrigerator box.  This defect is common to all Defective Gas Absorption Refrigerators referenced in this Complaint as they contain materially identical cooling units.

4.     The same design defect which can lead to leaks is present in all Plaintiffs and Class member's Defective Gas Absorption Refrigerators and Defective Cooling Units.

5.     While Defendant knew of the Defect at least by 2001 (and likely earlier), it failed to promptly notify members of the Class and the National Highway Transportation Safety Administration ("NHTSA") of the defect, as required by the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act") for several years, until August 2006.  Even then, despite initiating two safety recalls to address the common defect in 2006 (O6E-076) and 2008 (08E-032), the "recall kits" installed as part of that process were never designed to prevent leaks from developing – a fact never disclosed but instead actively concealed from the Class by Defendant. The recall kits do not "remedy" the defect. Instead, at best, the kits were designed to shut the refrigerator's power down in the event of a high-temperature event created by the leak, limiting certain ignition sources for escaping flammable materials.   However, because any competent ignition source (including but not limited to the cooling unit's heater) within proximity to the refrigerator can ignite the flammable cooling unit solution, and the same noxious solution can cause severe respiratory distress (*inter alia*), the safety threat related to leaks remains even after installation of the recall kit. Indeed, complaints of leaks, fires, and escaping noxious fumes continue through present despite installation of any recall kit.

6.     Defendant used the recall process as a means to conceal the continuing and still-existent safety risks inherent in their Defective Gas Absorption Refrigerators from consumers as well as federal regulators.  At no time did Defendant warn, notify, or otherwise alert Class members that the safety risk of leaks, fires, and noxious fumes, remained.  Instead, Defendant sought to avoid disrupting sales and to minimize its recall costs by not revealing this fact and choosing the low-cost "recall kit" instead of a safer, more comprehensive modification or outright cooling unit replacement to reduce the safety risk.

7.     Defendant's concealment of material facts regarding the latent defect induced sales and caused Class members to unknowingly purchase dangerously defective refrigerators and cooling units (and RV's containing them) and suffer injury by, *inter alia*, (1) overpaying for such items at inflated prices higher than they would have had the material facts that were concealed about inherent safety risks been disclosed; and/or (2) being denied the benefit of their bargain (namely their bargain to purchase and obtain a safe and defect-free product, instead of one with an inherent safety defect, that is worth less money or worthless due to the need to replace it).

8.     At all relevant times since 2001 Defendant had exclusive and/or superior knowledge of the product defects and inherent risk of the danger involved in their continued use and thus, had an affirmative duty to disclose such risks about its dangerously defective products to consumers in the Class, both pre- and post-sale. Defendant has actual knowledge of the leak and fire claim history, the design defect of its gas absorption refrigerators, testing results, engineers and other experts' reports and, upon information and belief, maintains records of incidents of fire claims and warranty returns.  Upon information and belief, Defendant also possessed documents and other records confirming the existence of the defect and Defendant's knowledge thereof well before it elected to finally inform NHTSA of the defect in 2006, as well as the limited effectiveness of any

"recall kit". This information is not readily available to consumers in the Class. Upon information and belief, Defendant also possesses documents and other records advising it that the recall kits do not prevent leaks and that Defendant had not disclosed that material fact to members of the Class.

9. Given the safety risks presented and its superior knowledge, at all times Defendant had an affirmative and ongoing duty, both pre- and post-sale, to conspicuously disclose material facts about the defect and limitations of the recall kits to Plaintiffs and all members of the Class. Defendant provided no notice of the inherent and potential risks of use of its product to consumers at the time of sale or acquisition (or thereafter), but rather concealed those risks through omissions of material fact while implying in marketing, sales, and operational materials that the products were safe and defect-free, and that recall kits were an effective fix for the defect. By and through such conduct, Defendant breached the duties of care that it owed to Plaintiffs and the Class members, including the ongoing duty to disclose material facts and duty to warn them of dangerous defects in its refrigerators.

10. Plaintiffs are consumers, many of whom reside in this state, who purchased RV's containing at least one of the subject Defective Gas Absorption Refrigerators and/or Defective Cooling Units containing the common defect. Each Plaintiff complains that during the Class Period they owned a Defective Gas Absorption Refrigerator and/or Defective Cooling Unit that shared a common design defect in the cooling unit when it left Dometic's possession, and that Dometic continuously failed to disclose that fact despite having an ongoing duty to disclose risks and remedy continuing safety defects. Plaintiffs present claims for violation of consumer protection statutes and/or breach of implied warranty based on the failure to provide them the benefit of their bargain and inducing them to overpay for the defective product through material omissions. Due to the material omissions regarding the continuing existence of the safety defect, even

after the recall, each Plaintiff was deceived and misled.  But for the material facts that were concealed Plaintiffs, like reasonable consumers, would have acted differently such as by not purchasing the refrigerator or demanding a replacement cooling unit or an equivalent price discount or reduction of the inflated price premium so a replacement could be obtained.  Each Plaintiff, therefore, has suffered common injury, incurred out-of-pocket loss, and damage as they possess a valueless cooling unit that requires replacement in order to eliminate the safety risks presented and provide them the benefit of their bargain – a defect-free unit. Each Plaintiff paid an inflated price for their Defective Gas Absorption Refrigerators and Defective Cooling Unit.

11.    The facts concealed by Defendant about the defect are material, as reasonable consumers, like Plaintiffs and the members of the Class, would have wanted to know those facts when making a decision to purchase or retain a Defective Gas Absorption Refrigerator and Defective Cooling Unit, both initially and after any recall.  Defendant's conduct deprived them of their right to make an informed consumer decision.  Reasonable consumers would not have purchased Defective Gas Absorption Refrigerators and Defective Cooling Units had they been told the material facts that were concealed about the defect and the ongoing safety risks, including risks post-recall.  The failure to disclose these material facts constitutes deceptive and fraudulent conduct in violation of state consumer protection laws.

12.    While Dometic knew of the safety defect by at least 2001 (if not sooner), it constantly concealed material facts pertaining to the existence of the defect and the continuing safety risks it presented in order to keep selling refrigerators and cooling units to members of the Class unhindered by the customer's knowledge of the defect which certainly would have depressed sales.[1]

---

[1] *See* Expert Report of William Peck in *Nat'l Interstate v. Dometic Corp.*, No. 02-cv-0027, 2000 WL 34593169 (M.D. Fla. Dec. 20, 2000) (describing leak and fire in a Dometic refrigerator due to "fatigue failure."); Expert Report of Charles

Once it finally decided to notify the NHTSA and commence its first safety recall in August 2006, it still did not disclose the continuing nature of the defect and fact that chosen "remedy" (*i.e.*, the recall kit) was never designed to stop cooling units from leaking flammable and noxious materials.  Because Dometic's recall kit was never designed to stop leaks from occurring, leaks and fires have continued to occur in units that obtained the recall kit.

13.    All Class members possess an RV that, once the nature of the defect is disclosed, is of diminished value due to the presence of Defendant's Defective Gas Absorption Refrigerator and Defective Cooling Unit.  No Class member obtained the refrigerator/cooling unit they believed they were purchasing or retaining based on Defendant's fraudulent and deceptive conduct and omissions.  As such, Plaintiffs are entitled to the benefit of the initial bargain they entered into when they purchased their RV's and/or refrigerators: a refrigerator that does not contain the latent defects in the cooling unit detailed herein and is therefore safe to use for its intended purpose, or cash compensation equal to that difference in value.  This lawsuit seeks such remedies and confers a public benefit.

14.    Among other appropriate monetary, injunctive, and declaratory relief, Plaintiffs seek to have Defendant (1) notify the class of the safety risks associated with the defect, including, but not limited to, the fact that the recall kits do not stop leaks; (2) eliminate the safety risk by replacing the defective and dangerous refrigerators/cooling units distributed to the Class with non-defective units; (3) provide restitution; and (4) compensate Class members for the diminution of value of their RV's, the lost benefit of their bargains, and/or overpayments made as a result of the defect.  This case does not seek recovery for personal injuries on a

---

Giessling in *Nat'l Interstate v. Dometic Corp.*, No. 05-cv-00405, 2006 WL 2332334 (E.D. Tex. July 14, 2003)(describing April 2003 fire in a NDR 1062 model concluding "the cause of the fire is related to a failure with the Dometic refrigerator.").

class-wide or individual basis. Such claims are expressly excluded from the claims presented and reserved.

## II.   JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

16. Plaintiffs are residents of California, Colorado, New Jersey, Louisiana, Ohio, Arkansas, Maine, and Virginia, who own or owned Defective Gas Absorption Refrigerators at relevant times, including during the Class Period. Plaintiffs were harmed and injured financially as a result Defendant's conduct, as described further herein.

17. Defendant Dometic Corporation is a Delaware corporation with principal offices in Louisville, Kentucky, and manufacturing facilities in Elkhart, Indiana. Defendant is the successor in interest of Dometic LLC and liable for all of its debts, liabilities and duties. Dometic LLC ceased to exist as a result of a merger on or about December 12, 2012. All debts, liabilities and debts of Dometic LLC attach to Dometic Corporation. Defendant Dometic is registered to do business in California, and throughout the United States.

18. Defendant Dometic Corporation is affiliated with Dometic AB, a publically traded company located in Sweden. Dometic Corporation and Dometic AB have jointly worked to commit acts complained of herein pertaining to the recall, traded the safety of the Class in order to minimize recall costs, and failed to promptly and completely notify the Class of material facts described further herein.

19. The amount in controversy exceeds $5,000,000 and there are at least one thousand members in the putative Class.

20. This Court has jurisdiction over Dometic because it is a foreign corporation authorized to conduct business in California, does business in

California, directly or through agents, and has registered with the California Secretary of State such that it has sufficient minimum contacts with California, or otherwise intentionally avails itself of the California consumer market through the promotion, marketing, sale, and service of gas absorption refrigerators, cooling units, and other products in California.  This purposeful availment renders the exercise of jurisdiction by this Court over Dometic or related entities permissible under traditional notions of fair play and substantial justice. Certain Plaintiffs reside in California and Dometic had a duty to notify those Plaintiffs about the defect and safety risks in California each day, continuing through the present.

21.    Upon information and belief, Dometic maintains offices and facilities at 7130 Sycamore Canyon Drive, Riverside, California, and/or other locations in California from which Defective Gas Absorption Refrigerators and Defective Cooling Units are placed into the stream of commerce by Dometic and distributed to Class members in California as well as other states.  Dometic also conducts business through a network of RV dealers in California, including many in this district from which Defective Gas Absorption Refrigerators and Defective Cooling Units are placed into the stream of commerce by Dometic and distributed to class members in California as well as other states. *See* https://www.dometic.com/en-us/us/find-a dealer?maxResults=500&distance=60&location[lat]=36.778261&location[lng]=-119.41793239999998&partnerType=dealer&stationary=&onroad=

22.    Venue is proper in this District under 28 U.S.C. § 1391 because Dometic transacts business and may be found in this District and a substantial portion of the practices complained of herein occurred in the Central District of California.  Numerous Class and Subclass members purchased Defective Gas Absorption Refrigerators in California and within this District.  Several named Plaintiffs reside and owned a Defective Gas Absorption Refrigerator in this

District and Dometic had a duty to notify Plaintiffs about the defect and safety risks in this District.

23.     All conditions precedent to this action have occurred, been performed, or have been waived.

24.     By way of letters dated June 16, 2016 and August 9, 2017, Defendant was notified of its violations of consumer protection laws, including but not limited to the California Legal Remedies Act, Cal. Civ. Code § 1770 *et seq.* ("CLRA"), for the conduct described herein. By these letters, Plaintiffs demanded that Defendant provide a classwide remedy that rectifies its misconduct. Despite provision of written notice to Defendant of the asserted violation of the CLRA and other applicable laws, pursuant to Cal. Civ. Code § 1782, to-date Defendant has not agreed to rectify the conduct complained of as described within on a classwide basis and provide any relief demanded. Hence, Plaintiffs assert a claim for damages and other appropriate relief under the CLRA at this time.

### III.     PARTIES

**A.     PLAINTIFFS**

  **1. James Zimmer**

25.     Plaintiff James Zimmer ("Zimmer") is a consumer residing in Glendora, California. In or around 2013, Mr. Zimmer purchased a used 2006 Keystone Springdale fifth wheel trailer in Burbank, California at Metro RV. The RV came equipped with a 6 cu. ft. Dometic DM2652 gas absorption refrigerator as original equipment. Zimmer purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV. Dometic profited from his purchase of the RV as it understands that RV's are sold regularly on the secondary market, a fact which supports the initial purchase price of the RV and component refrigerators.

26.     At relevant times within the Class Period, Zimmer owned a Defective Gas Absorption Refrigerator and Defective Cooling Unit. The Defective Cooling

Unit was the same or substantially the same as all other Class members' Defective Cooling Units (Model 605, 606, 805, 806 which differ only in size). Dometic manufactured, sold, and/or distributed the Defective Cooling Unit which shares the same design and same defect as all Defective Cooling Units.

27. Mr. Zimmer never received a recall notice, however upon information and belief, the prior owner received the recall notice and had the retrofit kit installed on the Defective Gas Absorption Refrigerator in 2008. Because the recall kit does not prevent leaks or correct the inherent defect in the cooling unit, Mr. Zimmer's refrigerator and cooling unit remain defective and present a continuing safety risk, material facts never disclosed to him. Had Mr. Zimmer been aware of these facts, he would not have purchased the Defective Gas Absorption Refrigerator, or would have paid less for it.

28. As with other Class members, Dometic was responsible for notifying Mr. Zimmer of the defect, disclosing the safety risk, and for eliminating the safety risk. While Dometic could have notified Zimmer and other Plaintiffs and Class members of the defect and ongoing safety risks in various ways so they would be aware at the time of purchase and thereafter, including by affixing a permanent label, sticker, or badge on the refrigerator, or instructing OEM's and dealers to provide notice, Dometic chose not to and to instead conceal such facts.

29. Keystone contracted with Dometic to purchase refrigerators for the benefit of the RV buyer, as Keystone installs Dometic refrigerators in RV's manufactured solely for use by the RV owner. Dometic understands that the intended end-users of its refrigerators and cooling units will be the RV buyer (and any subsequent buyers), and that the RV buyer is the direct beneficiary of the contract it enters into with Keystone when it sells its gas absorption refrigerators, as it, rather than Keystone, provides the end user with a warranty on the refrigerator that includes the cooling unit. Therefore, RV owners like Mr. Zimmer are the intended and foreseeable beneficiary of Dometic's contract with Keystone.

30.     Further, under the Safety Act and other laws, Dometic has an ongoing and continuing duty to disclose safety defects both pre- and post-sale, to initial and subsequent RV buyers like Zimmer and members of the Class. It breached this duty by concealing material facts as described within injuring Zimmer and Class members.

31.     Had Mr. Zimmer been aware of the safety risks, he would not have purchased the Defective Gas Absorption Refrigerator/Defective Cooling Unit, or would have paid less for it.

32.     As a result of Dometic's conduct as described further within, Zimmer and Class members overpaid for all Defective Gas Absorption Refrigerators and Defective Cooling Units and failed to receive the benefit of their bargain.

**2. Melvin Rich**

33.     Plaintiff Melvin Rich ("Rich") is a consumer residing in Redding, California. In or around 2002 or 2003, Mr. Rich purchased a used 1997 Forest River Sandpiper fifth wheel trailer from a private party in Grass Valley, California. The RV came equipped with a Defective Gas Absorption Refrigerator as original equipment. Rich purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV. Dometic profited from his purchase of the RV as it understands that RV's are sold regularly on the secondary market, a fact which supports the initial purchase price of the RV and component refrigerators.

34.     At relevant times within the Class Period, Rich owned a Defective Gas Absorption Refrigerator and Defective Cooling Unit. The Defective Cooling Unit was the same or substantially the same as all other Class members' Defective Cooling Units (Model 605, 606, 805, 806 which differ only in size). Dometic manufactured, sold, and/or distributed the Defective Cooling Unit which shares the same design and same defect as all Defective Cooling Units.

35.     Mr. Rich never received a recall notice and the recall retrofit kit was not installed on his unit.

36.     As with other Class members, Dometic was responsible for notifying Mr. Rich of the defect, disclosing the safety risk, and for eliminating the safety risk.  While Dometic could have notified Rich and other Plaintiffs and Class members of the defect and ongoing safety risks in various ways so they would be aware at the time of purchase and thereafter, including affixing a permanent label, sticker, or badge on the refrigerator, or instructing original equipment manufacturers ("OEM's") and dealers to provide notice, Dometic chose not to and to instead conceal such facts.

37.     In early 2009, Mr. Rich's Defective Gas Absorption Refrigerator failed resulting in a fire. Shortly thereafter, Rich replaced the destroyed refrigerator with the same model Defective Gas Absorption Refrigerator. Despite the replacement, Mr. Rich's refrigerator and cooling unit remain defective and present a continuing safety risk, material facts never disclosed to him. Had Mr. Rich been aware of these facts, he would not have purchased any Defective Gas Absorption Refrigerator or Defective Cooling Unit, or would have paid less for it.

38.     Forest River contracted with Dometic to purchase refrigerators for the benefit of the RV buyer, as Forest River installs Dometic refrigerators in RV's manufactured solely for use by the RV owner. Dometic understands that the intended end-users of its refrigerators and cooling units will be the RV buyer (and any subsequent buyers), and that the RV buyer is the direct beneficiary of the contract it enters into with Forest River when it sells its gas absorption refrigerators, as it, rather than Forest River, provides the end user with a warranty on the refrigerator that includes the cooling unit. Therefore, RV owners like Mr. Rich are the intended and foreseeable beneficiary of Dometic's contract with Forest River.

39.     Further, under the Safety Act and other laws, Dometic has an ongoing and continuing duty to conspicuously disclose safety related defects, both pre- and post-sale, to initial and subsequent RV buyers like Rich and members of the Class.  It breached this duty by concealing material facts as described within, injuring Rich and Class members.

40.     Had Mr. Rich been aware of the safety risks, he would not have purchased the Defective Gas Absorption Refrigerator/Defective Cooling Unit, or would have paid less for it.

41.     As a result of Dometic's conduct as described further within, Rich and Class members overpaid for all Defective Gas Absorption Refrigerators and Defective Cooling Units and failed to receive the benefit of their bargain.

**3.  Ernie Arnold**

42.     Plaintiff Ernie Arnold ("Arnold") is a consumer residing in Murrieta, California. Mr. Arnold purchased a new 2004 Thor Fury, 38 Foot Toy Hauler from Marjon RV in Moreno Valley, California. The RV came equipped with an 8 cu. ft. Defective Gas Absorption Refrigerator as original equipment. Arnold purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV, the sale from which Dometic directly profited.

43.     At relevant times within the Class Period, Arnold owned at least one Defective Gas Absorption Refrigerator and Defective Cooling Unit. The Defective Cooling Unit was the same or substantially the same as all other Class members' Defective Cooling Units (Model 605, 606, 805, 806 which differ only in size). Dometic manufactured, sold, and/or distributed the Defective Cooling Unit which shares the same design and same defect as all Defective Cooling Units.

44.     Mr. Arnold never received a recall notice for this refrigerator and the recall retrofit kit was not installed on his unit.

45.     As with other Class members, Dometic was responsible for notifying Mr. Arnold of the defect, disclosing the safety risk, and for eliminating the safety

risk. While Dometic could have notified Arnold and other Plaintiffs and Class members of the defect and ongoing safety risks in various ways so they would be aware at the time of purchase and thereafter, including by affixing a permanent label, sticker, or badge on the refrigerator, or instructing OEM's and dealers to provide notice, Dometic chose not to and to instead conceal such facts.

46.    After experiencing refrigerator issues and having the refrigerator recharged and other service work on the refrigerator, Mr. Arnold sold the 2004 Thor Fury, 38 Foot Toy Hauler to an individual in October 2016.

47.    In or around January 2017, Mr. Arnold bought a new 2015 Fleetwood Terra from Giant RV in Colton, California. The RV came equipped with a Dometic DM2852 gas absorption refrigerator manufactured in 2014 as original equipment. Arnold purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV, the sale from which Dometic directly profited.

48.    Dometic manufactured the Defective Cooling Unit in Arnold's 2015 Fleetwood RV after Dometic's recalls, and installed as original equipment the recall kit. Because the recall kit does not prevent leaks or correct the inherent defect in the cooling unit, Mr. Arnold's cooling unit remains defective and presents a continuing safety risk, material facts never disclosed to him. Had Mr. Arnold been aware of these facts, he would not have purchased the Defective Gas Absorption Refrigerators, or would have paid less for them.

49.    In each case, Thor Industries and Fleetwood Motors contracted with Dometic to purchase refrigerators for the benefit of the RV buyer, as they install Dometic refrigerators in RV's manufactured solely for use by the RV owner. Dometic understands that the intended end-users of its refrigerators and cooling units will be the RV buyer (and any subsequent buyers), and that the RV buyer is the direct beneficiary of the contract it enters into with Thor Industries and Fleetwood Motors when it sells its gas absorption refrigerators, as it, rather than

the original equipment manufacturers, provide the end user with a warranty on the refrigerator that includes the cooling unit.  Therefore, RV owners like Mr. Arnold are the intended and foreseeable beneficiary of Dometic's contracts with Thor Industries and Fleetwood Motors.

50.    Further, under the Safety Act and other laws, Dometic has an ongoing and continuing duty to disclose safety defects both pre- and post-sale, to initial and subsequent RV buyers like Arnold and members of the Class.   It breached this duty by concealing material facts as described within, injuring Arnold and Class members.

51.    Had Mr. Arnold been aware of the safety risks, he would not have purchased the Defective Gas Absorption Refrigerator/Defective Cooling Unit, or would have paid less for it.

52.    As a result of Dometic's conduct as described further within, Arnold and Class members overpaid for all Defective Gas Absorption Refrigerators and Defective Cooling Units and failed to receive the benefit of their bargain.

**4. Sandra Greene**

53.    Plaintiff Sandra Greene, Ph.D. ("Greene") is a consumer residing in Woodland Hills, California. Ms. Greene purchased a used 2011 Coachmen Concord 301SS on August 17, 2016 from Camping World in Katy, Texas. The RV came equipped with a Dometic refrigerator model 2652 as original equipment. Greene purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV. Dometic profited from her purchase of the RV as it understands that RV's are sold regularly on the secondary market, a fact which supports the initial purchase price of the RV and component refrigerators.

54.    At relevant times within the Class Period, Greene owned a Defective Gas Absorption Refrigerator and Cooling Unit.  The Defective Cooling Unit was the same or substantially the same as all other Class members' Cooling Units (Model 605, 606, 805, 806 which differ only in size). Dometic manufactured,

sold, and/or distributed the Defective Cooling Unit which shares the same design and same defect as all Defective Cooling Units.

55.     Dometic manufactured Greene's cooling unit after Dometic's recalls, and installed as original equipment the recall kit. Because the recall kit does not prevent leaks or correct the inherent defect in the cooling unit, Greene's cooling unit remains defective and presents a continuing safety risk, material facts never disclosed to her. Had Greene been aware of the safety risks, she would not have purchased the Defective Gas Absorption Refrigerator, or would have paid less for it.

56.     As with other Class members, Dometic was responsible for notifying Greene of the defect, disclosing the safety risk, and for eliminating the safety risk. While Dometic could have notified Greene and other Plaintiffs and Class members of the defect and ongoing safety risks in various ways so they would be aware at the time of purchase and thereafter, including by affixing a permanent label, sticker, or badge on the refrigerator, or instructing OEM's and dealers to provide notice, Dometic chose not to and to instead conceal such facts.

57.     In August, 2017, Greene experienced smoke coming from the rear of her refrigerator. Plaintiff paid service costs related to the fire incident and related repair incurring out-of-pocket financial loss.

58.     Coachmen contracted with Dometic to purchase refrigerators for the benefit of the RV buyer, as Coachmen installs Dometic refrigerators in RV's manufactured solely for use by the RV owner. Dometic understands that the intended end-users of its refrigerators and cooling units will be the RV buyer (and any subsequent buyers), and that the RV buyer is the direct beneficiary of the contract it enters into with Coachmen when it sells its gas absorption refrigerators, as it, rather than Coachmen, provides the end user with a warranty on the refrigerator that includes the cooling unit. Therefore, RV owners like Ms. Greene

are the intended and foreseeable beneficiary of Dometic's contract with Coachmen.

59.     Further under the Safety Act and other laws, Dometic has an ongoing and continuing duty to disclose safety defects both pre- and post-sale, to initial and subsequent RV buyers like Greene and members of the Class.  It breached this duty by concealing material facts as described within injuring Greene and Class members.

60.     Had Greene been aware of the safety risks, she would not have purchased the Defective Gas Absorption Refrigerator/Defective Cooling Unit, or would have paid less for it.

61.     As a result of Dometic's conduct as described further within, Greene and Class members overpaid for all Defective Gas Absorption Refrigerators and Defective Cooling Units and failed to receive the benefit of their bargain.

**5. Steven Horner, Sr.**

62.     Mr. Steven E. Horner, Sr. ("Horner") is a consumer residing in West Chester, Ohio. In or around 2005 he purchased a 2005 Forest River Cardinal at American RV in El Paso, Texas. The RV came equipped with RM2852 Dometic gas absorption refrigerator as original equipment. Horner purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV from which Dometic directly profited.

63.     At relevant times within the Class Period, Horner owned a Defective Gas Absorption Refrigerator and Defective Cooling Unit. The Defective Cooling Unit was the same or substantially the same as all other Class members' Defective Cooling Units (Model 605, 606, 805, 806 which differ only in size). Dometic manufactured, sold, and/or distributed the Defective Cooling Unit which shares the same design and same defect as all Defective Cooling Units.

64.     As with other Class members, Dometic was responsible for notifying Mr. Horner of the defect, disclosing the safety risk, and for eliminating the safety

risk. While Dometic could have notified Horner and other Plaintiffs and Class members of the defect and ongoing safety risks in various ways so they would be aware at the time of purchase and thereafter, including by affixing a permanent label, sticker, or badge on the refrigerator, or instructing OEM's and dealers to provide notice, Dometic chose not to and to instead conceal such facts.

65.    In or around 2009, Mr. Horner received a recall notice. Shortly after receiving the notice, Mr. Horner had the recall retrofit work performed on his Dometic Unit. However, the kit failed and a new one was installed. Because the recall kit does not prevent leaks or correct the inherent defect in the cooling unit, Mr. Horner's cooling unit remained defective and presented a continuing safety risk, material facts never disclosed to him. Had Mr. Horner been aware of these facts, he would not have purchased the Defective Gas Absorption Refrigerator, or would have paid less for it.

66.    Forest River contracted with Dometic to purchase refrigerators for the benefit of the RV buyer, as it installs it in the RV solely for use by the RV owner. Dometic understands that the intended user of its refrigerators and cooling units will be the RV buyer, and that the RV buyer is the direct beneficiary of the contract it enters into with Forest River when it sells its gas absorption refrigerators, as it, rather than Forest River, provides the end user with a warranty on the refrigerator that includes the cooling unit. Therefore, RV owners like Mr. Horner are the intended and foreseeable beneficiary of Dometic's contract with Forest River.

67.    Further, under the Safety Act and other laws, Dometic has an ongoing and continuing duty to disclose safety defects both pre- and post-sale, to initial and subsequent RV buyers like Horner and members of the Class.  It breached this duty by concealing material facts as described within injuring Horner and Class members.

68.     Had Mr. Horner been aware of the safety risks, he would not have purchased the Defective Gas Absorption Refrigerator/Defective Cooling Unit, or would have paid less for it

69.     As a result of Dometic's conduct as described further within, Horner and Class members overpaid for all Defective Gas Absorption Refrigerators and Defective Cooling Units and failed to receive the benefit of their bargain.

**6. James Jackson**

70.     Plaintiff James Jackson ("Jackson") is a consumer residing in Texarkana, Arkansas. In or around 2004, Mr. Jackson purchased a 2002-2003 Prowler Fifth Wheel from Shady Pines RV Dealership in Texarkana, Texas. The RV came equipped with a Dometic gas absorption refrigerator as original equipment. Jackson purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV. Dometic profited from his purchase of the RV as it understands that RV's are sold regularly on the secondary market, a fact which supports the initial purchase price of the RV and component refrigerators.

71.     At relevant times within the Class Period, Jackson owned a Defective Gas Absorption Refrigerator and Defective Cooling Unit. The Defective Cooling Unit was the same or substantially the same as all other Class members' Defective Cooling Units (Model 605, 606, 805, 806 which differ only in size). Dometic manufactured, sold, and/or distributed the Defective Cooling Unit which shares the same design and same defect as all Defective Cooling Units.

72.     Mr. Jackson never received a recall notice and the recall retrofit kit was not installed on his unit.

73.     As with other Class members, Dometic was responsible for notifying Mr. Jackson of the defect, disclosing the safety risk, and for eliminating the safety risk. While Dometic could have notified Jackson and other Plaintiffs and Class members of the defect and ongoing safety risks in various ways so they would be aware at the time of purchase and thereafter, including by affixing a permanent

label, sticker, or badge on the refrigerator, or instructing OEM's and dealers to provide notice, Dometic chose not to and to instead conceal such facts.

74. In approximately 2008, Mr. Jackson's Defective Gas Absorption Refrigerator failed resulting in a fire.

75. In approximately 2009 Mr. Jackson purchased a used 2005 Keystone Laredo at RV City in Benton, Arkansas (the "2005 Keystone Laredo"). The RV came equipped with Dometic gas absorption refrigerator as original equipment. Jackson purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV. Dometic profited from his purchase of the RV as it understands that RV's are sold regularly on the secondary market, a fact which supports the initial purchase price of the RV and component refrigerators.

76. Jackson never received a recall notice.

77. As with other Class members, Dometic was responsible for notifying Mr. Jackson of the defect, disclosing the safety risk, and for eliminating the safety risk.

78. In or about 2016 the Defective Gas Absorption Refrigerator in the 2005 Keystone Laredo failed and Mr. Jackson was told he needed a new cooling unit. Instead of spending approximately $2300 to buy a new cooling unit, Mr. Jackson traded in his 2005 Laredo RV for a 2016 Forest River Puma Fifth Wheel at Shady Pines RV Dealer in Texarkana, Texas in or about June 2016 ("the 2016 Forest River Puma"). Mr. Jackson was told by Shady Pines that the trade-in value of the Laredo 2005 RV was much less because of the Defective Dometic Unit that needed a new cooling unit. Mr. Jackson went ahead with the deal knowing he lost money on the trade. The new 2016 Forest River Puma came equipped with an 8 cu. ft. DMR702 Dometic gas absorption refrigerator.

79. With respect to each Defective Gas Absorption Refrigerator owned by Jackson, the OEM's contracted with Dometic to purchase refrigerators for the benefit of the RV buyer, as OEM's install the Dometic refrigerators in the RV

solely for use by the RV owner. Dometic understands that the intended user of its refrigerators and cooling units will be the RV buyer, and that the RV buyer is the direct beneficiary of the contract it enters into with OEM's when it sells its gas absorption refrigerators, as it, rather than OEM's, provides the end user with a warranty on the refrigerator that includes the cooling unit. Therefore, RV owners like Mr. Jackson are the intended and foreseeable beneficiary of Dometic's contract with OEM's.

80.    Further, under the Safety Act and other laws, Dometic has an ongoing and continuing duty to disclose safety defects both pre- and post-sale, to initial and subsequent RV buyers like Jackson and members of the Class.   It breached this duty by concealing material facts as described within injuring Jackson and Class members.

81.    Had Mr. Jackson been aware of the safety risks, he would not have purchased the Defective Gas Absorption Refrigerator/Defective Cooling Unit, or would have paid less for it.

82.    As a result of Dometic's conduct as described further within, Jackson and Class members overpaid for all Defective Gas Absorption Refrigerators and Defective Cooling Units and failed to receive the benefit of their bargain.

**7. James Mitchell**

83.    Plaintiff James Mitchell ("Mitchell") is a consumer residing in Evergreen, Colorado. In approximately 2012-2013, Mr. Mitchell purchased a used 2006 Heartland Bighorn in Arizona. The RV came equipped with an 8 cu. ft. RM2862 Dometic gas absorption refrigerator as original equipment. Mitchell purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV.  Dometic profited from his purchase of the RV as it understands that RV's are sold regularly on the secondary market, a fact which supports the initial purchase price of the RV and component refrigerators.

84.    At relevant times within the Class Period, Mitchell owned a Defective Gas Absorption Refrigerator and Defective Cooling Unit. The Defective Cooling Unit was the same or substantially the same as all other Class members' Defective Cooling Units (Model 605, 606, 805, 806 which differ only in size). Dometic manufactured, sold, and/or distributed the Defective Cooling Unit which shares the same design and same defect as all Defective Cooling Units.

85.    Mr. Mitchell never received a recall notice for his refrigerator.

86.    As with other Class members, Dometic was responsible for notifying Mr. Mitchell of the defect, disclosing the safety risk, and for eliminating the safety risk. While Dometic could have notified Mitchell and other Plaintiffs and Class members of the defect and ongoing safety risks in various ways so they would be aware at the time of purchase and thereafter, including by affixing a permanent label, sticker, or badge on the refrigerator, or instructing OEM's and dealers to provide notice, Dometic chose not to and to instead conceal such facts.

87.    The Dometic recall kit was installed in Mr. Mitchell's Defective Gas Absorption Refrigerator. Because the recall kit does not prevent leaks or correct the inherent defect in the cooling unit, Mr. Mitchell's cooling unit remains defective and presents a continuing safety risk, material facts never disclosed to him. Had Mr. Mitchell been aware of these facts, he would not have purchased the Defective Gas Absorption Refrigerator, or would have paid less for it or taken other steps to protect his interests and safety.

88.    Heartland contracted with Dometic to purchase refrigerators for the benefit of the RV buyer, as Heartland installs Dometic refrigerators in RV's manufactured solely for use by the RV owner. Dometic understands that the intended end-users of its refrigerators and cooling units will be the RV buyer (and any subsequent buyers), and that the RV buyer is the direct beneficiary of the contract it enters into with Heartland when it sells its gas absorption refrigerators, as it, rather than Heartland, provides the end user with a warranty on the

refrigerator that includes the cooling unit. Therefore, RV owners like Mr. Mitchell are the intended and foreseeable beneficiary of Dometic's contract with Heartland.

89.     Further, under the Safety Act and other laws, Dometic has an ongoing and continuing duty to disclose safety defects both pre- and post-sale, to initial and subsequent RV buyers like Mitchell and members of the Class.   It breached this duty by concealing material facts as described within, injuring Mitchell and Class members.

90.     Had Mr. Mitchell been aware of the safety risks, he would not have purchased the Defective Gas Absorption Refrigerator/Defective Cooling Unit, or would have paid less for it.

91.     As a result of Dometic's conduct as described further within, Mitchell and Class members overpaid for all Defective Gas Absorption Refrigerators and Defective Cooling Units and failed to receive the benefit of their bargain.

**8. Kurt Shoemaker, Sr.**

92.     Kurt M. Shoemaker, Sr. ("Shoemaker") is a consumer who resides in Pennsville, New Jersey. In or around July 2004, Mr. Shoemaker purchased a new 2005 Sunline 28 foot Travel Trailer from Slicer's Travel Trailer Sales in New Castle, Delaware. The RV came equipped with an 8 cu. ft. Dometic gas absorption refrigerator as original equipment. Shoemaker purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV, the sale from which Dometic directly profited.

93.     At relevant times within the Class Period, Shoemaker owned a Defective Gas Absorption Refrigerator and Defective Cooling Unit. The Defective Cooling Unit was the same or substantially the same as all other Class members' Defective Cooling Units (Model 605, 606, 805, 806 which differ only in size). Dometic manufactured, sold, and/or distributed the Defective Cooling Unit which shares the same design and same defect as all Defective Cooling Units.

94.     Mr. Shoemaker never received a recall notice for his refrigerator and the recall retrofit kit was not installed on his unit.

95.     As with other Class members, Dometic was responsible for notifying Mr. Shoemaker of the defect, disclosing the safety risk, and for eliminating the safety risk. While Dometic could have notified Shoemaker and other Plaintiffs and Class members of the defect and ongoing safety risks in various ways so they would be aware at the time of purchase and thereafter, including by affixing a permanent label, sticker, or badge on the refrigerator, or instructing OEM's and dealers to provide notice, Dometic chose not to and to instead conceal such facts.

96.     In or around October of 2011 in preparation for a camping trip on Columbus Day weekend, Mr. Shoemaker noticed his Defective Gas Absorption Refrigerator was not properly cooling down. He was unable to use the refrigerator during this camping trip. Upon inspection of the refrigerator, he noticed yellow residue on the floor and at the back of the refrigerator. This yellow residue was sodium chromate and was visible as a result of a leaking cooling unit. Sodium chromate is supposed to stay enclosed in the cooling unit boiler tubes with the water, flammable hydrogen gas and noxious ammonia.  He contacted Camping World in Bridgeport, New Jersey, and purchased a new refrigerator in October, 2011 incurring out-of-pocket financial loss.

97.     Shoemaker had his new refrigerator installed at Camping World in Bridgeport, New Jersey in March 2012. Despite the replacement, Mr. Shoemaker's refrigerator and cooling unit remain defective and present a continuing safety risk, material facts never disclosed to him. Had Mr. Shoemaker been aware of these facts, he would not have purchased the Defective Gas Absorption Refrigerator, or would have paid less for it.  He did not get the benefit of his bargain from either the Defective Gas Absorption Refrigerator or the Defective Cooling Unit purchased.

98.     In or around April 2015, Mr. Shoemaker traded in his 2005 Sunline Trailer for a new 2015 Forest River Trailer at Driftwood RV in Cape May Courthouse, New Jersey. The RV came equipped with a DMR702 model Dometic gas absorption refrigerator as original equipment.

99.     In each case, the original equipment manufacturer contracted with Dometic to purchase refrigerators for the benefit of the RV buyer, as OEM's install Dometic refrigerators in RV's manufactured solely for use by the RV owner. Dometic understands that the intended end-users of its refrigerators and cooling units will be the RV buyer (and any subsequent buyers), and that the RV buyer is the direct beneficiary of the contract it enters into with OEM's when it sells its gas absorption refrigerators, as it, rather than OEM's, provides the end user with a warranty on the refrigerator that includes the cooling unit. Therefore, RV owners like Mr. Shoemaker are the intended and foreseeable beneficiary of Dometic's contract with OEM's.

100.   Further, under the Safety Act and other laws, Dometic has an ongoing and continuing duty to disclose safety defects both pre- and post-sale, to initial and subsequent RV buyers like Shoemaker and members of the Class.  It breached this duty by concealing material facts as described within, injuring Shoemaker and Class members.

101.   Had Mr. Shoemaker been aware of the safety risks, he would not have purchased the Defective Gas Absorption Refrigerator/Defective Cooling Unit, or would have paid less for it.

102.   As a result of Dometic's conduct as described further within, Shoemaker and Class members overpaid for all Defective Gas Absorption Refrigerators and Defective Cooling Units and failed to receive the benefit of their bargains.

### 9.  Randall Ortego

103.  Plaintiff Randall Ortego ("Ortego") is a consumer residing in Gonzales, Louisiana. In or around 2014, Mr. Ortego purchased a used 2006 Forest River Salem 27 Foot Travel Trailer from Blanchard Trailer Sales in Baton Rouge, Louisiana.   The RV came equipped with an 8 cu. ft. RM2652 Dometic gas absorption refrigerator as original equipment. Ortego purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV. Dometic profited from his purchase of the RV as it understands that RV's are sold regularly on the secondary market, a fact which supports the initial purchase price of the RV and component refrigerators.

104.   At relevant times within the Class Period, Ortego owned a Defective Gas Absorption Refrigerator and Defective Cooling Unit. The Defective Cooling Unit was the same or substantially the same as all other Class members' Defective Cooling Units (Model 605, 606, 805, 806 which differ only in size). Dometic manufactured, sold, and/or distributed the Defective Cooling Unit which shares the same design and same defect as all Defective Cooling Units.

105.   Mr. Ortego never received a recall notice for his Dometic Unit and the recall retrofit kit was not installed on his unit.

106.   As with other Class members, Dometic was responsible for notifying Mr. Ortego of the defect, disclosing the safety risk, and for eliminating the safety risk. While Dometic could have notified Ortego and other Plaintiffs and Class members of the defect and ongoing safety risks in various ways so they would be aware at the time of purchase and thereafter, including by affixing a permanent label, sticker, or badge on the refrigerator, or instructing OEM's and dealers to provide notice, Dometic chose not to and to instead conceal such facts.

107.  Mr. Ortego has been trying to sell the Forest River RV for two months to no avail.

108.   Forest River contracted with Dometic to purchase refrigerators for the benefit of the RV buyer, as Forest River installs Dometic refrigerators in RV's manufactured solely for use by the RV owner. Dometic understands that the intended end-users of its refrigerators and cooling units will be the RV buyer (and any subsequent buyers), and that the RV buyer is the direct beneficiary of the contract it enters into with Forest River when it sells its gas absorption refrigerators, as it, rather than Forest River, provides the end user with a warranty on the refrigerator that includes the cooling unit. Therefore, RV owners like Mr. Ortego are the intended and foreseeable beneficiary of Dometic's contract with Forest River.

109.   Further, under the Safety Act and other laws, Dometic has an ongoing and continuing duty to disclose safety defects both pre- and post-sale, to initial and subsequent RV buyers like Ortego and members of the Class.   It breached this duty by concealing material facts as described within injuring Ortego and Class members.

110.   Had Mr. Ortego been aware of the safety risks, he would not have purchased the Defective Gas Absorption Refrigerator/Defective Cooling Unit, or would have paid less for it.

111.   As a result of Dometic's conduct as described further within, Ortego and Class members overpaid for all Defective Gas Absorption Refrigerators and Defective Cooling Units and failed to receive the benefit of their bargain.

**10. Debra Sadler**

112.   Plaintiff Debra Sadler ("Sadler") is a consumer residing in Bland, Virginia. In 2016 she purchased a 2007 Tiffin Allegro from Camping World in Roanoke, Virginia. The RV came equipped with a Dometic gas absorption refrigerator as original equipment. Sadler purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV. Dometic profited from her purchase of the RV as it understands that RV's are sold regularly on the

secondary market, a fact which supports the initial purchase price of the RV and component refrigerators.

113. At relevant times within the Class Period, Sadler owned a Defective Gas Absorption Refrigerator and Defective Cooling Unit. The Defective Cooling Unit was the same or substantially the same as all other Class members' Defective Cooling Units (Model 605, 606, 805, 806 which differ only in size). Dometic manufactured, sold, and/or distributed the Defective Cooling Unit which shares the same design and same defect as all Defective Cooling Units.

114. As with other Class members, Dometic was responsible for notifying Ms. Sadler of the defect, disclosing the safety risk, and for eliminating the safety risk. While Dometic could have notified Sadler and other Plaintiffs and Class members of the defect and ongoing safety risks in various ways so they would be aware at the time of purchase and thereafter, including by affixing a permanent label, sticker, or badge on the refrigerator, or instructing OEM's and dealers to provide notice, Dometic chose not to and to instead conceal such facts.

115. Ms. Sadler's refrigerator and cooling unit remain defective and present a continuing safety risk, material facts never disclosed to her. Had Ms. Sadler been aware of these facts, she would not have purchased the Defective Gas Absorption Refrigerator, or would have paid less for it.

116. Tiffin contracted with Dometic to purchase refrigerators for the benefit of the RV buyer, as Tiffin installs Dometic refrigerators in RV's solely for use by the RV owner. Dometic understands that the intended user of its refrigerators and cooling units will be the RV buyer, and that the RV buyer is the direct beneficiary of the contract it enters into with Tiffin when it sells its gas absorption refrigerators, as it, rather than Tiffin, provides the end user with a warranty on the refrigerator that includes the cooling unit. Therefore, RV owners like Ms. Sadler are the intended and foreseeable beneficiary of Dometic's contract with Tiffin.

117. Further, under the Safety Act and other laws, Dometic has an ongoing and continuing duty to disclose safety defects both pre- and post-sale, to initial and subsequent RV buyers like Sadler and members of the Class. It breached this duty by concealing material facts as described within, injuring Sadler and Class members.

118. Had Sadler been aware of the safety risks, she would not have purchased the Defective Gas Absorption Refrigerator/Defective Cooling Unit, or would have paid less for it

119. As a result of Dometic's conduct as described further within, Sadler and Class members overpaid for all Defective Gas Absorption Refrigerators and Defective Cooling Units and failed to receive the benefit of their bargain.

**11. Richard Haisch**

120. Plaintiff Richard Haisch ("Haisch") is a consumer residing in Sidney, Maine. In October 2016, Mr. Haisch purchased a used 2011 Keystone Laredo travel trailer from Buffalo RV in Buffalo, New York. The RV came equipped with a DM2862 model Dometic gas absorption refrigerator as original equipment. Haisch purchased the Defective Gas Absorption Refrigerator as a component of the total price of the RV. Dometic profited from his purchase of the RV as it understands that RV's are sold regularly on the secondary market, a fact which supports the initial purchase price of the RV and component refrigerators.

121. At relevant times within the Class Period, Haisch owned a Defective Gas Absorption Refrigerator and Defective Cooling Unit. The Defective Cooling Unit was the same or substantially the same as all other Class members' Defective Cooling Units (Model 605, 606, 805, 806 which differ only in size). Dometic manufactured, sold, and/or distributed the Defective Cooling Unit which shares the same design and same defect as all Defective Cooling Units.

122. As with other Class members, Dometic was responsible for notifying Mr. Haisch of the defect, disclosing the safety risk, and for eliminating the safety

risk. While Dometic could have notified Haisch and other Plaintiffs and Class members of the defect and ongoing safety risks in various ways so they would be aware at the time of purchase and thereafter, including by affixing a permanent label, sticker, or badge on the refrigerator, or instructing OEM's and dealers to provide notice, Dometic chose not to and to instead conceal such facts.

123. Dometic manufactured Mr. Haisch's cooling unit after Dometic's recalls, and installed as original equipment the recall kit. Because the recall kit does not prevent leaks or correct the inherent defect in the cooling unit, Mr. Haisch's cooling unit remains defective and presents a continuing safety risk, material facts never disclosed to him. Had Mr. Haisch been aware of the safety risks, he would not have purchased the Defective Gas Absorption Refrigerator, or would have paid less for it.

124. Keystone contracted with Dometic to purchase refrigerators for the benefit of the RV buyer, as Keystone installs Dometic refrigerators in RV's solely for use by the RV owner. Dometic understands that the intended user of its refrigerators and cooling units will be the RV buyer, and that the RV buyer is the direct beneficiary of the contract it enters into with Keystone when it sells its gas absorption refrigerators, as it, rather than Keystone, provides the end user with a warranty on the refrigerator that includes the cooling unit. Therefore, RV owners like Mr. Haisch are the intended and foreseeable beneficiary of Dometic's contract with Keystone.

125. Further, under the Safety Act and other laws, Dometic has an ongoing and continuing duty to disclose safety defects both pre- and post-sale, to initial and subsequent RV buyers like Haisch and members of the Class. It breached this duty by concealing material facts as described within, injuring Haisch and Class members.

126.   Had Mr. Haisch been aware of the safety risks, he would not have purchased the Defective Gas Absorption Refrigerator/Defective Cooling Unit, or would have paid less for it.

127.   As a result of Dometic's conduct as described further within, Haisch and Class members overpaid for all Defective Gas Absorption Refrigerators and Defective Cooling Units and failed to receive the benefit of their bargain.

128.   Dometic has failed to disclose to each of the above-named Plaintiffs that they are currently in possession of a defective refrigerator that makes them susceptible to the risk of ammonia inhalation and fire. There were no written or oral notices or warnings of the inherent defects in the cooling units, or the safety risks of continued use of the product provided to any Plaintiff. This information is material to each Plaintiff, members of the Class, and to all reasonable consumers. Dometic had an ongoing duty throughout the Class Period to disclose these facts to Plaintiffs and members of the Class both pre- and post-sale. Reasonable consumers, like Plaintiffs and members of the Class, would want to know about the inherent defects, ongoing risks, and safety hazards of their refrigerators when making a purchasing decision.

129.   None of the above-named Plaintiffs obtained the benefit of their bargain when they purchased and/or replaced their Defective Gas Absorption Refrigerators and Defective Cooling Units. Each Plaintiff expected and agreed to purchase a refrigerator and cooling unit free from the latent defects described herein. Because of Dometic's omission of material facts, each Plaintiff has paid an unwarranted price premium for their Defective Gas Absorption Refrigerators and Defective Cooling Units. Had Dometic disclosed the inherent safety defects contained in its Defective Gas Absorption Refrigerators and Defective Cooling Units, each Plaintiff would have acted differently, including but not limited to, paying less or requiring a non-defective cooling replacement at the time of sale without any additional cost. The inflated price premium is equal to no less than

the amount each Plaintiff must expend to replace the cooling unit with a non-defective one. Dometic's wrongful conduct has caused and will continue to cause each Plaintiff and all similarly situated Class members to suffer an injury in fact that is common to them and all Class members. Each Plaintiff will prove at trial the amount of damages that they and Class members have incurred.

130. Each above-named Plaintiff, like the members of the Class, personally have standing to assert the claims alleged herein as each Plaintiff has been injured, damaged, suffered cognizable loss, and incurred loss of money by reason of the conduct of Defendant described further herein. At relevant times within the Class Period, each Plaintiff owned a recreational vehicle with a Defective Gas Absorption Refrigerator containing a Defective Cooling Unit that was marketed, sold, manufactured, and/or distributed by Defendant, where the risk and possibility of leaks and/or fire has either occurred, and/or remains actual or imminent, but was never disclosed. Defendant has a continuing and ongoing duty to conspicuously disclose the defect and safety risk in each Defective Gas Absorption Refrigerator to each Plaintiff, pre- and post-sale.

131. The Class, defined more fully below, includes all persons who, during the Class Period, purchased and/or owned a Defective Gas Absorption Refrigerator manufactured by Defendant in California, Arizona, Delaware, New Jersey, Louisiana, Texas, Arkansas, Virginia, and New York. The Defective Gas Absorption Refrigerators at issue in this case consist of ten models: RM/DM2652; RM/DM2662; RM/DM2663; RM/DM2852; RM/DM2862; RM/DM3662; RM/DM3663; RM/DM3862; RM/DM3863; and NDR1062.[2] All of these Defective Gas Absorption Refrigerators share the same "gas absorption cooling technology," whereby highly flammable hydrogen gas and ammonia, along with sodium chromate and water, comprise the cooling solution inside sealed and

---

[2] In 2008, the nomenclature on the model numbers changed from RM to DM prefixes, without any material change in the models or cooling units.

pressurized cooling units attached to the refrigerators.   All Defective Gas Absorption Refrigerators share materially common cooling units (Models 605, 606, 805, or 806 – referred to herein as "Defective Cooling Units") that differ only slightly in size. There is no material difference across these cooling unit models and the common design defect that causes the cooling units to corrode and develop stress fatigue, weakening the boiler tubes in all and causing many to eventually leak, is inherent in each.   Because of the commonality of the defect in the Defective Cooling Units, all were subject to the same recalls in 2006 and 2008 and provided the same ineffective recall kit that was never designed to stop leaks. Defendant had an ongoing duty to clearly and conspicuously disclose to all Class members at the time of sale (new or used), and continuously at all times thereafter, that the units presented a safety risk and that the recall was never designed to prevent leaks of flammable and noxious materials from occurring.

132.   Each Plaintiff and Class member suffered actual economic loss and injury at the point of sale by overpaying for a Defective Gas Absorption Refrigerator and/or Defective Cooling Unit.  Additionally, each Plaintiff and Class member suffered a loss in value and loss of usefulness in the Defective Gas Absorption Refrigerator and/or Defective Cooling Unit purchased.

133.   Paying more for a product than it is actually worth and/or receiving a product of diminished value, as here, is an actual and concrete injury and as such constitutes an injury in fact for Plaintiffs and all Class members

134.   Each Plaintiff and Class member did not receive the benefit of their bargain and/or overpaid for their Defective Gas Absorption Refrigerator and/or Defective Cooling Unit

135. Each Defective Gas Absorption Refrigerator and/or Defective Cooling Unit was sold with a common defective design. A consequence of the defective design is that when used as intended, the cooling units' boiler tubes weaken, are and remain susceptible to experience stress fatigue and corrosion,

develop microscopic cracks, and leak and expel flammable and noxious materials in the vicinity of a competent ignition source which can cause a fire or otherwise permanently disable the unit rendering it worthless. Thousands of the Defective Cooling Units placed into the stream of commerce by Defendant have leaked since 2001 and leaks continue to occur unabated by the recall kit.  To eliminate the safety risk and be safe, an expenditure by each Class member is needed, *inter alia*, to install a non-defective cooling unit that does not present the same safety risks.

136.   The market effect of the defect is actual or imminent. As soon as the truth regarding the concealed facts becomes widely known to the Class and market, Class members' property will drop in value owing to the defect once the truth regarding the concealed facts alleged herein becomes widely known to the Class and market.  Reasonable consumers are less willing to buy RV's containing Defective Gas Absorption Refrigerators and/or Defective Cooling Units given the risk of a leak, fire, and/or release of noxious materials presented.

137.   The defect is latent. Because Class members cannot see inside the boiler tubes or readily view the microscopic cracks they cannot know when a dangerous leak will develop until it is too late.

138.   Plaintiffs and each Class member overpaid for their Defective Gas Absorption Refrigerator.   Refrigerators with defective cooling units presenting a safety risk are worth less than cooling units that do not contain such defects. Plaintiffs and members of the Class were never told all material facts regarding the defect, recall, and the recall kit's inability to stop leaks. Plaintiffs would have paid less for their RV and/or refrigerator (so they could fund a non-defective replacement), or purchased a different product that did not possess the same defect, had they known these facts.

139.   Plaintiffs, like each Class member, did not receive the benefit of their bargain when purchasing a Defective Gas Absorption Refrigerator since a

defective cooling unit presenting safety risks is worth less than the defect-free unit they bargained for and expected to receive.  This is true even with cooling units that have been retrofitted with a recall kit since the recall kit does not prevent leaks from occurring (a fact that Defendant never disclosed and actively concealed) and fires have continued to occur with regularity through the present in cooling units that have had the recall kit installed.  In order to eliminate the serious safety risks involved with the continued use of Defendant's defective products, each Plaintiff and Class member have or will be forced to incur out-of-pocket expenses to remove and replace the cooling unit in their defective refrigerators (or the entire refrigerator) with cooling units that are not defective and do not present a safety risk.  Those costs include, but are not limited to, parts and labor to remove, replace, and dispose of Defendant's cooling units.  These costs are common to all Plaintiffs and members of the Class and constitute economic losses and damages directly and proximately caused by the Defendant's wrongful, deceptive, and misleading conduct as set forth herein.  Regardless of a manifested leak or fire, each Plaintiff has been injured, *inter alia*, because his or her injuries consist of economic losses, which include the diminished value of his or her refrigerator and overpayments.

140.  Once the full extent and complete truth about the Defective Gas Absorption Refrigerators and the continuing risk of fire, despite recalls, is made public, the value of any Defective Gas Absorption Refrigerator will drop, causing further injury to Plaintiffs and the Class.

141.  Classwide damages showing economic loss, overpayment, and lost benefit of the bargain can be established in this case through expert testimony after performing certain analyses and surveys that are valid and reliable including, but not limited, to conjoint or regression analysis.

142.  Plaintiffs seek, *inter alia*, recovery of the difference between the value of the RV as delivered with the Defective Gas Absorption Refrigerator, and

the value those RV's would have had had it been delivered as bargained for, as warranted and not in a defective state.  Plaintiffs suffered economic loss and injury-in-fact because Defendant's Gas Absorption Refrigerators were defective at the moment of purchase, and at all times continuing thereafter, due to Defendant's concealment of material facts.  Plaintiffs bargained for completely safe products, but did not receive such products. Instead, Plaintiffs received dangerous products highly susceptible to the risk of fire within the products' useful and anticipated life, which are in turn, worthless and need to be replaced.  As a result of the foregoing, Plaintiffs and all Class members lost the benefit of their bargain.

**B.  DEFENDANT**

143.  Defendant Dometic Corporation ("Defendant" or "Dometic") is a Delaware corporation with its headquarters and principal place of business at 9100 Shelbyville Rd. in Louisville, Kentucky.  Dometic Corporation is a wholly owned subsidiary of Dometic AB. Together both Dometic and Dometic AB are part of the "Dometic Group" and share a common, publically traded parent, Dometic Group AB.

144.  Defendant is the successor-in-interest of Dometic LLC and liable for all of its debts, liabilities, and interests.

145.  Defendant's Dometic-branded products, including the Defective Gas Absorption Refrigerators at issue, were and are sold and distributed throughout the United States by Defendant, including in this state.

146.  Dometic is one of two primary manufacturers of gas absorption refrigerators for RV's in the world.  The other is Norcold Corporation.

147.  Dometic maintains a significant market share in the business areas it operates, including with respect to gas absorption refrigerators used in RV's and boats.  *Our Business Areas*, DOMETIC, http://www.dometicgroup.com/en/Company/Business-Areas/ (last visited June 23, 2016) ("The Group serves industry clients as well as the aftermarket with a

complete range of products.  Recreational Vehicles (RV): We have close business relationships with and sell to almost all larger OEM customers of caravans, towables and motorhomes. Our market position is number one or two in almost all product categories in all three regions.").

148.   While until June 2001 refrigerators bearing the Dometic brand-name were sold by Defendant's predecessors, in June 2001 that company's assets and liabilities relating to the gas absorption refrigerator and cooling unit business were transferred to, and assumed by, Defendant.  Defendant assumed liability for defects in pre-June 2001 manufactured refrigerator units, as shown by NHTSA Recall 06E-076 and 08E-032, which represented that: (a) the refrigerators were manufactured by [Defendant] Dometic Corporation between April 1997 and May 2003; and b) Defendant was the responsible party for defect issues. *See* McConnell Deposition publically filed in *Bowman v. Dometic Corp.*, No. 15-CV-0089 (S.D. Iowa) at 69-80, 88-89 (Defendant is responsible the recall of refrigerators manufactured before 2001 and dating back to 1997).

149.   In 2009, as part of an operational restructuring, the gas absorption refrigerator and cooling unit manufacturing process was shifted from Dometic AB's plant in Sweden to Dometic's manufacturing facilities in Elkhart, Indiana. Again, while the manufacturing location changed, Defendant continued to sell and distribute the Defective Gas Absorption Refrigerators throughout the United States, as well as to consult with Dometic AB on matters related to the defect and continuing leak problems.

150. While prior to 2009 the refrigerators and cooling units were manufactured by Dometic AB in Sweden, at all times Dometic sold, distributed, marketed, and warrantied those units to consumers in the United States.[3] During this period Dometic and Dometic AB regularly consulted and assisted each other

---

[3] *See* 15 U.S.C. § 2052 (a)(11) (" The term "manufacturer" means any person who manufactures or imports a consumer product").

on design and manufacturing issues, including those related to the defect, leak testing, and the recalls.

151.   As with other vehicle or appliance sales, while the refrigerators were initially sold to RV manufacturers OEM's and distributed through retail RV dealerships, the intended end-users of the refrigerators were always consumers in the Class, not those intermediaries.   When the recall campaigns commenced, Dometic was the party responsible for notifying NHTSA as well as all consumers, and remedying the defect, not Dometic AB.[4]

## IV.   FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

## A.   Dometic Corporation and Gas Absorption Technology.

152.   Dometic (and/or its predecessors) has been in business since at least 1922.  *History*, DOMETIC,  http://www.dometicgroup.com/en/Company/History/ (last visited June 23, 2016) ("1922 (Munters and Baltzar von Platen invent the first refrigerator using absorption technology (AB Arctic)); 1925 (Electrolux acquires AB Arctic and initiates mass production of absorption refrigerators); …2001 (EQT III Ltd. acquires Electrolux assets and the Dometic operating and legal structure is created).").

153.   Dometic is one of two primary manufacturers of gas absorption refrigerators for RV's in the world.   The other manufacturer is Norcold Corp. Dometic has a significantly larger market share than Norcold. On its website, Dometic boasts that it "is still the absorption cooling specialist" and describes itself as follows:

> Dometic is the foundation of the Dometic Group and a product brand.
>
> Dometic was created as a brand in the US in 1968 when Electrolux Leisure Appliances was still part of the Electrolux Group.

---

[4] The Safety Act requires a manufacturer of motor vehicles and motor vehicle equipment to conduct a notification and free remedy campaign (commonly referred to as the "recall") when it discovers that its product contains a defect that is related to motor vehicle safety, regardless of whether the product warranty has expired. 49 U.S.C. §30118(c)(1); 49 C.F.R. §§573.6, 573.7.

It was natural that Dometic was selected as the company name when Electrolux divested Leisure Appliances in 2001 to EQT. Dometic's business is largely based on the patented invention of absorption cooling technology that goes back to 1922 when Carl Munters and Baltzar von Platen invented it. Dometic is still the absorption cooling specialist.

Dometic designs and manufactures high-quality, innovative products for the RV, marine, hotel, automotive, agriculture, and trucking industries. Under the Dometic brand, we supply these industries with an extensive range of appliances and products.

While the strength of the Dometic brand was born in the invention of absorption cooling technology for products such as coolers and refrigerators, the brand has grown to include climate control products, awnings, sanitation systems, windows and doors – all of which stand on their own as quality representatives of a truly global brand.

Today the Dometic brand is associated with market leadership, comfort, and strength. People entrust their adventures to Dometic, the world leader in providing a comfortable mobile lifestyle.

All our products and services share a common philosophy: To find out what people really need and want, then use that insight to create thoughtfully designed innovations that provide a better user experience that makes their lives more comfortable when they are away from home.

Local presence, a vast sales and service network, and a very close relationship to our markets are essential to being a trustworthy partner to the industries Dometic serves.

*About Dometic*, DOMETIC, http://www.dometic.com/USA/About-Dometic/ (last visited June 23, 2016).

154.   Dometic's President and CEO, Roger Johansson further describes Dometic's business and informs consumers that Dometic's products are high "quality" and "enrich people's experiences when away from home":

**Our Company**

Dometic's world is the world of mobile living.

We develop and offer products and solutions that enrich people's experiences when away from home, be it in a motorhome or caravan, boat, truck or simply outdoors. Cooling and heating are essential in our offering through air conditioners, refrigerators, cookers, water heaters, furnaces or portable coolers for a wide variety of use.

We offer delivery from manufacturing plants close to our customers, and a global distribution and support network to take care of after-sales and service. The majority of our products are manufactured at our own production facilities in Asia Pacific, Europe and the U.S.

Products are sold through multiple distribution channels under the following well established brands: Dometic, WAECO, Marine Air, Cruisair, Condaria, SeaLand, Mobicool and Atwood. Our brands have a solid reputation and are recognized for their high quality.

For us at Dometic, introducing smart, innovative products with high user-friendliness and quality is what drives us. As a result, we have become a premier provider of mobile comfort products for the RV (Caravans and Motorhomes), Marine, Commercial & Passenger Vehicle markets in more than 100 countries around the world.

I hope you will find our company interesting. If you have questions or ideas, please do not hesitate to contact us either through our sales organizations around the world or our head office in Solna, Sweden.

*Our Company*, DOMETIC, http://www.dometicgroup.com/en/Company/ (last visited June 23, 2016).

155. Defendant also promotes that its "core" company values include responsibility and attentiveness to consumer needs and demands, and that "we understand the end-users." *The Dometic Way*, DOMETIC, http://www.dometicgroup.com/en/Company/Our-Way/ (last visited June 23, 2016).

156. The common cooling systems in all Dometic RV and boat refrigerators use a nearly 100-year-old technology called "gas absorption."

157. Defendant holds itself out to the public as one of the world's leading gas absorption cooling specialists and manufacturers of gas absorption refrigerators for use in RV's and boats:

> Dometic's business is largely based on the invention of the absorption technology that goes back to 1922 when Carl Munters and Baltzar von Platen invented this cooling technology. Dometic is still the absorption cooling specialist.
>
> Dometic is known as the supplier of high quality products with a high degree innovation to the recreational vehicle, marine and commercial and passenger vehicle industries. Under the Dometic brand we supply these industries with a very extensive range of different appliances and products.
>
> While the strength of the Dometic brand was born on the invention of absorption technology, it has grown to include air conditioners, refrigerators, awnings, cookers, sanitation, lighting,

mobile power equipment, windows, doors, and other comfort products that stand on their own as quality representatives of a truly global brand. The Dometic brand is today associated with market leadership, quality and innovation. People entrust their adventures to Dometic, the world leader in comfort.

Based on the same absorption technology Dometic is also the brand used for minibars for hotel room, compact silent refrigerators for private/institutional use.

All our products and services share the common philosophy - to make that extra effort to find out what people really need and want. And then use that insight to create thoughtfully designed innovations that provide a better user experience and help make your life more comfortable, away from home. Local presence with a good established service network and very close relation to the markets are essential to become a trustful partner to the industries Dometic serves.

*Dometic*, DOMETIC, http://www.dometicgroup.com/en/Products/Dometic/ (last visited June 23, 2016).

158. Defendant's warranties pertaining to the Defective Gas Absorption Refrigerators tout its products as follows: "Congratulations, and Thank You for purchasing the industry's best built and best backed RV Refrigerator. Below you will find important warranty and maintenance information on Dometic's exclusive two (2) year warranty. Please take a few moments and familiarize yourself with the program. We at Dometic appreciate your business and are confident that you will have many years of trouble-free RV enjoyment."[5]  Nothing is stated regarding latent defects, safety risks and/or leak and fire history.

---

[5] *Installation and Operating Instructions*, DOMETIC, http://www.dometic.com/QBankFiles3/EPiServer/Dometic/US/Manuals/RV-manuals/Refrigerators/Dometic-DMR-DMC-Refrigerators-Manual-Web_29111.pdf (last visited June 23, 2016)

159. Beginning in at least 1997, and continuing thereafter, Dometic (and/or its affiliates or predecessors, whose conduct it is responsible for) designed, manufactured, assembled, marketed, sold, distributed, and/or otherwise placed into the stream of commerce gas absorption refrigerators for use in RV's and boats.

160. Gas absorption refrigerators generally consist of two primary components: an insulated cabinet and a separate cooling unit affixed to the back.

161. The Dometic gas absorption refrigerators at issue in this case generally come in two sizes: six cubic feet and eight cubic feet, and consist of ten models: RM/DM2652; RM/DM2662; RM/DM2663; RM/DM2852; RM/DM2862; RM/DM3662; RM/DM3663; RM/DM3862; RM/DM3863; and NDR1062 (a 9.2 cubic foot model). There is no difference between the RM models and corresponding DM models of the same model number. For example, a "RM2652" is the same as the "DM2652." Upon information and belief, Dometic changed the prefix due the need to reuse the serial numbers associated with the "RM" models.

162. While the Dometic refrigerator models are of slightly different size, for purposes of this case, there is no material difference and the common defect is inherent in each. Other than size, differences between the models are modest and cosmetic in nature. Each of the ten refrigerators at issue share one of four common Defective Cooling Units that are the same in all material respects: models 605, 606, 805 or 806. All Defective Gas Absorption Refrigerators models are designed by Defendant, and possess Defective Cooling Units that utilize the same technology, contain standardized design features, and are constructed with the same materials. All Defective Cooling Unit models use the same gauge of steel boiler tubing and are filed with the same flammable (hydrogen and ammonia) and noxious (ammonia) chemical gases, which are at the heart of the

defect challenged in this case.  The only difference between cooling unit models 605, 606, 805 or 806 is a slight difference in size.

163.   All of Defendant's Defective Gas Absorption Refrigerators containing Defective Cooling Units share the same technology, which involves a process whereby a solution of ammonia, water, sodium chromate, and hydrogen gas is heated by electricity or propane until it boils (approximately 400 degrees Fahrenheit), releasing ammonia gas.  The gas circulates through a series of tubes at approximately 450 psi.  As the ammonia gas is condensed to liquid and evaporates through interaction with the hydrogen gas, heat is removed from the refrigerator box, causing the temperature in the box to decrease and providing the refrigeration effect.  The series of tubes is referred to as a "cooling unit," and includes the heat source (propane and electric), as well as a condenser, evaporator, absorber, and solution tank.

164.   Because of the commonality of the Defective Cooling Units, the same defect was identified in all ten refrigerator models at issue in this case and reported to the NHTSA by Dometic: the boiler tubes can develop microscopic cracks from the fatigue stress and corrosion.  Once breached, highly flammable and noxious cooling solution (ammonia and hydrogen gas) can escape. Because the flammable gas escapes in close vicinity to a heat source (the unit's electric or propane heaters), a fire risk is presented.[6]  However, even if a fire does not ignite, a leak itself completely destroys the cooling unit because it is no longer sealed and pressurized.  Similar to a balloon with a hole or a Coke bottle with a crack, a cooling unit with a leak must be completely replaced.  Further, because ammonia is noxious, additional safety risks are present.

_____

[6] While the unit's heater is a primary ignition source in the event of a hydrogen gas leak, other ignition sources exist.  *See generally*, Order Denying Summary Judgment, *Nix v. Norcold*, No. 34-2014-00168143-CU-PL-GDS (Cal. Super. Ct. June 11, 2015) (explaining that expert reports demonstrate how hydrogen gas leaks from a gas absorption refrigerator can ignite from a number of sources including spontaneous combustion); Aff't of William Peck in *Nat'l Interstate v. Dometic Corp.* at ¶ 7, No. 02-cv-0027, (M.D. Fla. Mar. 10, 2003).

165.   More specifically, boiler tube leaks, exposing the unit to the risk of ignition and fire, occur due to the development of corrosion and stress fatigue failure in the cooling unit boiling tubes when the refrigerators are used as intended.  The corrosion and fatigue failure is the result of the inability of the thin steel tubing used by Defendant in its cooling units to withstand the fabrication and manufacturing process, and the stresses placed on the tubing during normal operation of the refrigerators, namely, high temperature, high pressure, and the effects of the corrosive cooling solution.  The combination of these factors causes microscopic cracks at and around the boiler tube – the section of the cooling unit that includes the electric heat inputs.  Microscopic cracks in the boiler tube section of the cooling unit cause highly flammable cooling solution to leak from the cooling unit.  When the solution in the cooling unit is reduced, the cooling unit can experience a heating event that causes the steel tubing to reach excessively high temperatures resulting in fires, either by ignition of the escaping flammable gases, or by ignition of the combustible unprotected wood inside the refrigerator compartment.  *See generally*, Layson, Peter D., Wensley, C. Alex, Keifer, Orion P., *Investigating Absorption Refrigerator Fires (Part 1)*, J. FIRE & ARSON INVESTIGATOR, Vol. 58, No. 4 (Apr. 2008); Wensley, Charles A., Layson, Peter D., Keifer, Orion P., Martini, L. Henry, and Richardson, Wesley, *Investigating Absorption Refrigerator Fires (Part 2)*, J. FIRE & ARSON INVESTIGATOR, Vol. 59, No.1, pp. 22-28 (July 2008).

166.  The Defective Cooling Unit in each Defective Gas Absorption Refrigerator is a sealed boiler system.  The boiler tube of the cooling unit is where heat is applied to the cooling solution through electric heaters contained in pockets welded to the side of the boiler tube.  Heat from the heaters then passes first through the wall of the heating element pockets and then through the welds connecting the heating pockets to the boiler tube.  The Defective Cooling Unit in each Defective Gas Absorption Refrigerator cycles through heating and cooling

periods multiple times per day when in operation.  These heating and cooling cycles create stress on the boiler tubes and lead to a breakdown of any protective layer on the inside of the boiler tubing that may have been established through pre-production treatment, or through the sodium chromate component of the cooling solution.  Once the protective layer is compromised, the corrosive cooling solution begins to reduce the boiler tube wall, creating microscopic corrosion pits and cracks.  When the wall of the boiler tube thins, cracks develop and the flammable substances can and do leak from inside the tubes through the area of breach, creating a fire risk because heat sources are also present.  Noxious ammonia also escapes. As a result of the defective design of the cooling units, leaks also manifest though the corrosive effect of the ammonia, which causes the interior wall of the boiler tube to corrode.  Higher temperature operation, vibration and shock loading through the normal use of the RV, and cracking in the wall of the boiler tubing all serve as mechanisms to defeat the effect of the sodium chromate.  The defect in the cooling unit is inherent in the design and is uniform in all Defective Cooling Units.

167.  The following diagram is illustrative of the of the gas absorption system:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



168.   The leaks and fires caused by Defendant's refrigerators create serious safety risks to users in that the flammable gases released in the event of a boiler tube leak – particularly the hydrogen – can explosively ignite and spread quickly through the refrigerator compartment and into the passenger area of the recreational vehicle.  Such leaks also pose a serious safety risk to any person or property in the vicinity of the recreational vehicle as refrigerator fires can spread quickly outside the RV to structures, other vehicles, and people nearby.  Leaks also present safety risks because ammonia is noxious and can injure people in the area surrounding an RV that has had a leak in the refrigerator.  This is a common defect present in all of Defendant's Gas Absorption Refrigerators and Defective Cooling Units, and this common defect carries the risk of property damage,

serious injury, or death to individuals using Defendant's products.  These material facts are not disclosed by Defendant to consumers purchasing and using its Defective Gas Absorption Refrigerators.

**B.     Dometic's Gas Absorption Cooling Units Share an Identical, Common, Inherent Design Defect.**

169.   Dometic's cooling unit has a dangerous design defect in the boiler tube assembly, which is located at the base of the unit and is comprised of the boiler tube, a heater pocket tube, the weld joining the two tubes, and the heating element or source (propane or electric).  The design defect is present in all Defective Cooling Units and consists of the use of thin steel tubes containing a highly corrosive environment, welded together, and subjected to stress from the thermal cyclical loading.  This design defect results in "fatigue" or other cracks of the boiler tubes (and subsequent leaking of the flammable, noxious gases) either from the thermal cyclical loading it experiences at the welds or the corrosion of the thin-steel tubes or a combination of both.  The cracking of the boiler tubes arise from the normal use of the refrigerators and is a result of the design defect.

170.    The thin steel boiler tube houses the ammonia, sodium chromate, and water solution.  Dometic welds to the side of the boiler tube a similar thin-steeled tube called a heater pocket that houses a heating element.  The welding of these thin-steeled tubes also creates a Heat Affected Zone ("HAZ") that reaches to the interior of the thin boiler tube and changes the composition of the steel to create a harder less ductile material that is impaired in its ability to respond to the thermal cyclical loading.  In addition, the low-alloy steel that Dometic uses in its boiler assembly exhibit preferential corrosion in the HAZ in aqueous environments like the one in Dometic's cooling units.

171.  The Defective Cooling Unit's cooling process begins with the application of heat to the heater pocket.  The heat source is either propane or electric.  When heated, the heating element in the heater pocket transfers heat

through the wall of the heater pocket to the weld and then to the boiler tube.  The surface area of the welds along the boiler tube is small, leading to a concentration of heat on the inner surface of the boiler tube wall adjacent to the weld.  The ammonia and water contained in the boiler tube then percolate to a boil sending ammonia gas into the system.  The gas circulates through a series of closed, pressurized tubes at approximately 451 psi.

172.  Gas absorption cooling units operate through cycles of heating and cooling that cause the boiler tube, the welds, and heater pocket to expand and contract discordant to each other.  The opposing forces of expansion and contraction lead to stress in the boiler tube assembly.  This cyclic thermal stress, when combined with the concentration of heat through the welds between the heater pockets and the boiler tube, can cause a breakdown of any protective corrosion layer on the inside of the boiler tubing that may have been established through pre-production treatment of the boiler tubing, or through the sodium chromate component of the cooling solution.  Once the protective layer is compromised, the highly corrosive cooling solution begins to eat away at the boiler tube wall.  Eventually the varying thermal cyclical loading experienced by the different parts of the boiler assembly and the corrosion of the thin-steeled tubing creates microscopic pits and cracks either separately or in combination.

173.  The cracking from the thermal cyclical loading occurs most often adjacent to the weld that holds the boiler tube to the heat pocket that supplies heat to the boiler from either the propane burner or the electric heater.  With each cycle, the fatigue crack becomes more pronounced.  When the crack breaks open, the cooling solution and hydrogen vent out of the cooling unit.  Leaks in the cooling unit also manifest though the corrosive effect of the ammonia, which causes the interior wall of the boiler tube to corrode.  Higher temperature operation, vibration and shock loading through the normal use of the RV, and

cracking in the wall of the boiler tubing all serve as mechanisms to defeat the effect of the sodium chromate.

174.   Corrosion weakens steel's ability to contain the high internal pressure of the cooling unit causing microscopic cracks in the boiler tube.  Regardless of whether the cause of the cracks is corrosion or the thermal cyclical loading, or a combination of both, the cracks allow highly flammable hydrogen and ammonia to flow into the area surrounding the back of the refrigerator where it can ignite when in contact with an ignition source.  Even if not ignited, the ammonia gas fumes pose a safety risk if inhaled by the occupants of the RV.  Moreover, once the design defect has caused the cracks and leaks, the cooling unit is rendered inoperable and must be replaced.

175.   All Defective Cooling Units employ the same boiler tube material, joining method (welding), operational modes, and ammonia solution.

176.   Dometic caused this common defect in the cooling unit by its choice to produce the cooling units with cost saving, thin, low-alloy steel tubing for the boiler tube assembly, and a cooling solution made of highly corrosive ammonia and water.  The use of welding to join the boiler tube to the heater pocket in the assembly introduces metallurgical changes to the steel tubing, at the HAZ, and creates physical restraints between the tubes, which result in cyclical loading stresses during the natural expansion and contraction of the steel during heating and cooling.  This physical configuration and the subsequent resulting stresses and thermal fatigue exacerbate the corrosion risk from the ammonia solution contained in the boiler tube.

177.   The defect in the cooling unit is inherent in the design and uniform in all Dometic Defective Cooling Units.  The internal corrosive environment of the ammonia solution is present the moment the cooling unit is manufactured, and accelerates through the normal use of the refrigerator.  Likewise, Dometic's materials choice and defective functional design that results in expansion and

COMPLAINT                                                                                              50

contraction of the boiler tube and the heater pocket tube at different rates is born in the cooling unit upon manufacture.  So too is the welding of the thin steel tubes that creates a HAZ area less able to respond to the constant expansion and contraction.   This inherent design defect results in the propensity for leaks to manifest during the cooling unit's normal operation destroying the functionality of the cooling unit and refrigerator and posing a risk to consumers.

178.   The defect is internal in the closed sealed system and not visible to a consumer at time of purchase or at any time thereafter by routine inspection.  The defect will be seen only when the leak manifests externally and the system malfunctions, or during a post-fire investigation.  However, when the leak occurs, without exception the cooling unit is ruined and cannot be repaired.

179.   The inherent and latent defect in Dometic's Defective Cooling Unit poses an ongoing dangerous safety risk to the public and, in particular, RV owners.   Hundreds, if not thousands, of fires have resulted from leaks in these Defective Cooling Units.  The fires ignited by the leaking gas spread very fast and can turn into raging infernos, causing millions of dollars of property damage and personal injury to those unfortunate enough to be inside the RV when a fire ignites.

## C.   Dometic Admits That A Common Defect Exists Through Its Recall Campaigns.

180.   On August 28, 2006, Dometic finally reported to NHTSA that a safety-related defect exists in the ten models of gas absorption refrigerators manufactured between April 1997 and May 2003 and initiated a limited initial recall, NHTSA Recall 06E-076.

181. The 2006 Recall (06E-076) was limited to Dometic 2-door refrigerator Models NDR1062, RM2652, RM2662, RM2663, RM2852, RM2862, RM3662, RM3663, RM3862, and RM3863 manufactured between April 1997 and May 2003.

182.   In the recall notice, Dometic described the safety defect as follows:

**Problem Description:** After some period of use, a fatigue crack may develop in the boiler tube of the covered refrigerators that may release a sufficient amount of pressurized coolant solution into an area where an ignition source may be present.  If this were to occur under certain conditions, the coolant could ignite and result in a fire.  On the basis of these facts, Dometic has determined that the refrigerators may contain a defect that relates to motor vehicle safety. We have notified the National Highway Traffic Safety Administration (NHTSA) of this determination, and we will be conducting a recall of the covered items pursuant to Campaign No. 06E-076.

183.   Dometic blamed the defect identified in Recall 06E-076 on the use of an oversized heater element that it had substituted for the standard sized heating element in the heater pocket of the boiler tube assembly of the cooling units installed on the identified refrigerator models.  The heating element excuse was a misrepresentation meant to distract from the actual defect inherent in the design of the cooling unit, namely the combination of the use of thin low-alloy steel welded together, the corrosive ammonia cooling solution, and the thermal cyclical loading experienced by the boiler assembly through the normal use of the refrigerator.  In truth, the design defect has the propensity to cause leaks in the boiler tube assembly regardless of size difference of the heating element, and many of the leaks and fires reported by consumers have occurred from cooling units with the standard sized heating element.

184.   By 2008, problems with leaks persisted and Dometic decided that it had to expand the recall population to same ten models of refrigerators manufactured from May 2003 through September 2006, NHTSA Recall 08E-032. The 2008 Recall involved all the same models, manufactured between June 1, 2003 and September 30, 2006, except Model RM3863, which, upon information and belief, had been discontinued by then.  In the 2008 recall notice to NHTSA, Dometic changed from blaming the oversized heating element for the safety

problem to fatigue cracking from an inconsistent weld process during this production period.

185.   While an inconsistent weld "process" may accelerate the cracking, the design of the boiler assembly as a whole (as described above) remains the root cause of the safety defect and any changes to the welding process have not eliminated the propensity for leaks and subsequent fires and noxious releases to occur.

186.   Because of the commonality of the cooling units and the inherent defect, in turn, the same one-size-fits-all "remedy" (*i.e.*, the "recall kit") was eventually proposed for owners of those ten refrigerator models as part of the recall campaigns.  For post-2006 manufactured models, the same recall kit was installed as new factory equipment.  Defendant did not initiate its recalls of the aforementioned refrigerators to eliminate the defects in said products that cause leaks and fires so as to render the products safe to use.  Rather, Defendant initiated product safety recalls as a low-cost alternative to providing a complete fix of the defects.  In doing so, Defendant concealed and masked the true nature and extent of the defects and dangers involved in the use of its product and misled consumers and federal regulators into believing that Defendant's recalls were both comprehensive and effective when they were not.

187.   Dometic misleadingly and falsely informed consumers in a form letter that the recall kit "*resolves* the safety issue related to the potential defect." (emphasis added). As detailed above, however, the recalls did not "resolve" or otherwise eliminate this problem and prevent the corrosion that could lead to a leak and fire.  The recall kits were never designed to stop leaks.  Instead, the recalls called for the installation of retrofit devices in the area of the boiler tubes, in order to: (a) detect temperature levels at the boiler tube and to shut down power to the refrigerator controls if a threshold temperature was exceeded; and (b) guard the refrigerator cabinet in the event of flames or excessive heat caused by a boiler

tube leak.  Post-2006 manufactured cooling units contain the same inherent defect as the recalled refrigerators, but are equipped with the recall kit factory installed. Notably, the recall kit does not prevent the boiler tubes from corroding and leaking, leading to the release of flammable gases and materials in the vicinity of a heat source, as well as noxious fumes.  Leaks and fires therefore have continued to occur in Defective Gas Absorption Refrigerators even if they have had the recall kit installed. These facts have been concealed from Plaintiffs and the Class by Dometic.

188.   There have been thousands of leaks in in Defective Gas Absorption Refrigerators and Defective Cooling Units since 2000. In 2016, Dometic's Claims Coordinator, Chris Jackson, filed a declaration in a fire case, *Bowman v. Dometic Corp*, No. 15-cv-0089 (S.D. Iowa), stating that Dometic has been party to at least 1466 injury and property damage lawsuits "related to refrigerator units" between 2000 and 2015.  Tens of thousands of other leaks that did not result in lawsuits have occurred and been reported to Defendant.  These incidents are on top of thousands of other leak incidents that were not recorded in Defendant's databases because they occurred outside the two-year warranty period.

189.   Dometic has failed to take care to maintain accurate and complete records of all leaks.  At best, they have maintained partial records.  Dometic has never attempted to conduct an accurate survey of consumers owning Defective Gas Absorption Refrigerators and Defective Cooling Units to ascertain the number or rate of leaks and failures.  At best, Dometic maintains partial records of leaks.

190.   Dometic has incomplete records of all leaks because, *inter alia*, Dometic has maintained a policy of telling owners of Defective Gas Absorption Refrigerators and Defective Cooling Units who experienced leaks and/or fires and/or noxious ammonia releases outside the short two year warranty period that Dometic is not responsible and that they should seek repairs, replacements, or

other relief through third parties, not Dometic.  Therefore, Dometic did not record and maintain accurate records of all leaks occurring in Defective Gas Absorption Refrigerators and Defective Cooling Units, including those that occurred outside the warranty period.  Dometic maintains no accurate statistics or records establishing that the incident rate is low or safety risks do not exist.

**D.   The Recall Kit Is Not A "Safety Remedy" As It Was Never Designed To Stop Leaks, And The Safety Risk Remains.**

191.   Defendant's post-sale actions are deceptive and misleading in that they conceal the dangers and risks inherent in the use of Defendant's products from consumers and federal regulators (*e.g.*, the NHTSA), and lead reasonable consumers to believe that there is a single design and manufacturing defect in some of its refrigerators that is corrected through its recalls, when in reality, there remains a common defect in all of its products, none of which are corrected through the product safety recalls Defendant has conducted.  Notwithstanding Defendant's recall and retrofit campaigns, the risk of fire remains.  This harm to consumers is the direct result of Defendant's intentional act of placing defective products into the stream of commerce, and Defendant's intentional decision to retrofit the product with devices that do not remedy the design and manufacturing defect so leaks do not occur.

192.   While Dometic engaged two recall campaigns in 2006 and 2008 to retrofit the cooling units, the critical problem that remains is that "recall kit" admittedly does not prevent the refrigerator from leaking, will not fix refrigerators that have already leaked, and dangerous leaks and fires continue to occur. *See Merfeld v. Dometic Corp.*, No. 16-cv-02096 (N.D. Iowa) (alleging that in October 2014, a Dometic refrigerator ignited causing a fire that consumed the plaintiff's recreational vehicle); *Bowman v. Dometic Corp.*, No. 15-cv-00089 (S.D. Iowa) (alleging that in May 2013, a Dometic refrigerator ignited causing a fire that consumed the plaintiff's recreational vehicle).  Upon information and belief,

thousands of leaks have occurred in the Defective Gas Absorption Refrigerator's cooling units, continuing through the present, including units which have had the recall kits installed.

193.   Despite being aware of the ongoing safety risks to consumers who possess cooling units susceptible to leak, Dometic has never done anything to actually repair or replace them with different units that do not leak and expel flammable and noxious chemicals.  Rather than repair the defective cooling units with those that do not leak, Dometic instead chose to engage a recall campaign aimed at installing cheap retrofit devices, recall kits, that are simply designed to act as failsafe devices which cut the refrigerator's power *after* a leak or fire occurs due to the defect, and present it as a "remedy."  Thus, a dangerous chemical leak must *first* occur for the retrofit device to even operate.

194.   The recall kit consists of three pieces – two heat sensors (called the Thermo-Disc and Thermo-Fuse) and a metal heat shield (the secondary burner housing assembly).  The purpose of the Thermo Fuse and Thermo Disk is simply to serve as a failsafe device to shut the refrigerator's power off in the event of *a leak that already occurred* and a resulting rise in temperature.  However, merely cutting power to the unit when an excessive temperature is reached does not eliminate all ignition sources for the gas.  Recognizing this, the purpose of the heat shield is to attempt to contain the range of a fire should one ignite as a result of a leak.  Fires, however, still occur and spread beyond the heat shield.

195.   Regardless of whether Class members have obtained the recall kit or not, each Class member continues to possess a dangerously defective refrigerator that is susceptible to corrode, leak flammable and noxious materials, and ignite.

196.   Neither of the above-mentioned retrofits works to eliminate the defects and inherent safety risks in Defendant's refrigerators.   As a result, common defects and risk of dangerous fires remain in Defendant's Defective Gas Absorption Refrigerators and Defective Cooling Units.  Neither of the retrofits are

designed to eliminate the propensity of the cooling units to leak cooling solution and flammable gases, which destroys the cooling unit and can cause fires. Neither of the retrofits are designed to eliminate the excessive temperatures leaking cooling units achieve, which also leads to fires. Neither of the retrofits are designed to stop the release of noxious materials from leaks.

197. Consumers are not told about the continuing safety risks until it is too late and they experience a leak. For example, one consumer reported after suffering a leak:

- 2009-01-24 08:06:05 EB, MA: "Had recall work completed, however refrigerator still failed due to cracked manifold. The recall did not address the true problem. Their telephone announcement clearly states there is a problem with cracking manifolds. We have been getting the same run around from Dometic as it seems everyone else is getting. I feel they should be responsible to replace the cooling unit. I have filed a petition in small claims court for replacing the unit."[7]

198. The website www.aboutautomobile.com contains similar listings of consumer complaints regarding their Dometic refrigerators, who only learned of the continuing defect and risk until after it was too late and they had suffered leaks:

- **Complaint Number**: 10777994. **Incident Date**: September 24, 2015
- **Description of the Complaint**: The contact owns a 2005 keystone mountaineer camper. The contact stated that smoke emitted from the camper. The contact inspected the camper and was unable to determine the origin of the smoke. Within moments, the camper caught fire. The fire department was present and stated that the refrigerator ammonia leaked and initiated the fire. The serial number was not available. The camper was not replaced. The manufacturer was not notified.

---

[7] *See* http://www.allworldauto.com/comments/DOMETIC_RM2852_comments_and_complaints_1937-12501-1.html (last visited August 17, 2016)

COMPLAINT                                                                     57

- **Complaint Number**:10496860.  **Incident Date**: February 4, 2013
- **Description of the Complaint**: The contact owns a dometic rm3862 refrigerator. The contact stated that the refrigerator was inoperable. The contact stated an engineer inspected the refrigerator and noticed a small fire in the gas burner chamber. The engineer extinguished the fire. The manufacturer was made aware of the failure and stated the refrigerator was included in NHTSA campaign number: 06e076000 (equipment) but they would not provide the repair because the recall repair was not performed when the notice was issued. The contact was not aware of the recall repair because he purchased the vehicle used. The refrigerator was not repaired.

- **Complaint Number**: 10277130. **Incident Date**: July 13, 2009
- **Description of the Complaint**:  The contact owns a 2004 air stream land yacht rv. The vehicle has a dometic refrigerator, model rm3862. On july 13, 2009, there was a storm and the contact suddenly noticed smoke coming from the storage area of the rv. Within seconds, the rv burst into flames. The fire department stated that the fire originated around the refrigerator area. A fire report was filed. The manufacturer stated that they will send a form. The Insurance company stated that the vehicle was destroyed. The serial number of the unit was unknown. The current and failure mileages were 28,000.[8]

199.   Dometic has taken the position that the safety defect in its gas absorption cooling unit is a warranty issue, without regard to the dangerous safety risk that exists in all of its Defective Cooling Units.  Indeed, Dometic has adopted a policy of denying all claims that fall outside of Dometic's short two-year warranty period; often it is only after commencing litigation that Dometic admits to consumers that it never sought to cure the inherent defect.  For example,

---

[8] *See*, Equipment Consumer Complaint, http://www.aboutautomobile.com/Equipment/Complaint/Dometic/RM3862/Equipment (last visited August 17, 2016).

Dometic filed a memorandum in a Kentucky litigation styled *Phelps v. Dometic*, No. 08-CI-00180 (Powell Cir. Court, KY) stating:

> The recall was not intended to address every leak that could occur in the unit. For example, fatigue leaks resulting from the cooling unit wearing out were not the subject of the recall. Rather, the recall was by its terms intended to address the risk of fire under very limited circumstances, with the designated repair the installation of a shroud, or secondary burner housing, around the burner to eliminate the risk of fire, and not the risk of leaks.

**E.    Dometic Knew Of The Defect As Far Back As 2000 And Failed To Timely Notify NHTSA And Its Consumers Of The Safety Defect.**

200.   Dometic knew that its cooling units were defective at least by 2000 when the initial warranty and subrogation claims involving leaks and fires started to be filed and experts started to describe the defect to Dometic.[9]   Dometic received expert investigators' reports in these fire cases explaining the safety risks to consumers due to the defect, long before Dometic notified NHTSA and any consumers in 2006. *See e.g.,* Expert Rprt. of William Peck in *Nat'l Interstate v. Dometic Corp.*, No. 02-cv-0027, 2000 WL 34593169 (M.D. Fla. Dec. 20, 2000) (describing leak and fire in a Dometic  refrigerator due to "fatigue failure" and further noting "Yellow caking, believed to be sodium chromate, was noted in the area below the AC heating element, which is indicative of a leak in the system"); Aff't of William Peck in *Nat'l Interstate*, (M.D. Fla. Mar. 10, 2003) (describing leak and fire that occurred on November 2000 in a Dometic  refrigerator due to "stress fracture or crack"); Aff't of Charles Proctor in *Nat'l Interstate*, (M.D. Fla. Mar. 10, 2003);  Dep. of Charles Proctor II in *Nat'l Interstate*, at p. 12. (Doc 59)

---

[9] *See* Chris Jackson Decl. in *Bowmam v. Dometic* Corp. 15-cv-0089 (S.D. Iowa) ("Between 2000 and 2015, Dometic Corp. had 1466 claims for personal injury and/or property damage arising from or related to refrigerator units sold by Dometic Corp."). *See also*, Dep. Bruce Boxum in *Franklin v. Dometic Corp.*, No. 09-cv-268, at pp. 38-51 (E.D. Tenn.) (Dometic Claims Coordinator noting in a 2001 deposition over a fire in a RM 2852 refrigerator that he first started to keep a limited log of fire claims in 2001).

(M.D. Fla. Mar. 6, 2003) ("It's my understanding that this system is charged, pressurized and so at this time that it would be leaking through a crack prior to the fire…"); Expert Report of Charles Giessling in *Nat'l Interstate v. Dometic Corp.*, No. 05-cv-00405, 2006 WL 2332334 (E.D. Tex. July 14, 2003) (describing April 2003 fire in a NDR 1062 model concluding "the cause of the fire is related to a failure with the Dometic refrigerator.").

201.    Moreover, upon information and belief, Defendant maintains non-public databases partially documenting the leak and fire history of its Defective Gas Absorption Refrigerators and Defective Cooling Units, and therefore at all times has had actual knowledge that the defects in its gas absorption refrigerators was causing damage to users of its products due to leaks, even those that had the recall kits installed.  Notwithstanding this knowledge, information on these reports regarding continuing boiler tube leaks were not disclosed to the Class but instead concealed.  The only time Defendant disclosed the fact that the recall kits were never designed to prevent or stop leaks was after the consumer suffered a leak and Dometic was attempting to deny responsibility for any loss.  Defendant never stopped marketing, selling, and placing the dangerously defective refrigerators into the stream of commerce.  Defendant never provided users of the refrigerators with adequate advance warnings of the risks of use of the product.  Rather, Defendant actively concealed and minimized the dangers and risks inherent in its defective products from consumers until it was too late.

**F.    Consumers Were Never Told That The Defect Continued To Exist, The Recall Does Not Prevent Leaks, And Leaks And Fires Continue, In Violation Of Defendant's Ongoing Duty To Disclose Material Facts Concerning A Dangerous Product It Placed Into The Stream Of Commerce.**

202.    While leaks and fires have occurred continuously since 2000, critically Dometic never told any Class members material facts about the

continuing defect and fact the recall kits did not stop leaks, in violation of its duty to disclose safety risks both pre- and post-sale.

203.   A fraudulent omission is actionable under the laws set forth herein if the omission is of a fact the defendant was obliged to disclose.  Defendant here had an ongoing duty to disclose all material facts regarding the Defective Gas Absorption Refrigerators and their continuing dangers as Defendant: (1) had superior and exclusive knowledge of material facts not known to the Plaintiffs and the Class members; and (2) actively concealed material facts from Plaintiffs and the Class members.

204.   Defendant has a duty to manufacture defect-free products and an ongoing duty to disclose details about known defects, hazards, and unreasonable safety risks (such as the fire risks here) regardless of any warranty period both truthfully and completely.  Due to the serious and unreasonable dangers involved, Defendant's duty to disclose known defects is ongoing and continuing.  The refrigerators that Defendant manufactured and placed into the stream of commerce have at least one common defect that poses a serious risk of fire and injury, but Defendant has never fully eliminated that defect, notwithstanding the existence of alternative designs that would lessen or eliminate the risks.  On the contrary, Defendant continues to market its refrigerators as reliable and defect-free products knowing that its products are dangerously defective and fires are still occurring in them.  Defendant has a duty to recall and cure the defect in their products or replace the products so that they can be operated safely.

205.   While Defendant conducted two product safety recalls and represented that the retrofits would render the products safe to use, it has actual knowledge that the retrofits do not work in that, *inter alia*: (a) they do not fully eliminate the defect that causes the risk of fire in the first place; and (b) they are ineffective to counter the risks posed by the defects.  Defendant's products continue to cause fires even after any recall or any retrofit is installed and

Defendant maintains and conceals information regarding the continued risk of fires in their Defective Gas Absorption Refrigerators even after the recall. These facts, however, are not disclosed to the members of the Class and instead constitute material omissions.

206. Defendant also had a duty to notify Class members of the defect and safety risks pursuant to the Safety Act. The National Traffic and Motor Vehicle Safety Act of 1966, codified in Chapter 301 of Title 49 of the United States Code, ("Safety Act") requires a manufacturer of motor vehicles and motor vehicle equipment to conduct a notification and free remedy campaign (a "recall") when it discovers that its product contains a defect that is related to motor vehicle safety (commonly referred to as a "safety-related defect" or a "safety defect"). 49 U.S.C. § 30118(c)(1). The duty to provide notice and a remedy extends to all current owners (including secondary purchasers of RV's), not just the original owner.

207. Specifically, the Safety Act, 49 U.S.C. § 30018(c)(1), provides that a manufacturer shall notify the agency and owners when it "learns that a vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety." In enforcing this requirement, the NHTSA has construed this provision to mean that an actual safety defect decision *per se* by the manufacturer is not necessary to establish a violation of § 30018(c)(1) if the facts are such that the manufacturer should have in good faith made such a determination. In other words, a manufacturer cannot lawfully avoid its recall responsibilities by ignoring the evidence of a safety defect. The precursor to § 30118(c)(1), which contained substantially similar language, has been held to impose on a manufacturer the duty to notify and remedy whether it actually determined, or it should have been determined, that its products are defective and the defect is safety-related.

208. Pursuant to the Safety Act, Dometic should have notified NHTSA (and in turn, the Class) within five (5) days of learning of a potential safety defect.

49 C.F.R. § 573.6(b). [10]   Dometic was aware of this requirement but ignored it. *See* McConnell Deposition publically filed in *Bowman v. Dometic Corp.*, No. 15-CV-0089 (S.D. Iowa) at 69-80, 88-89 (acknowledging obligation to report any safety related defects to NHTSA within 5 days).

209.   Defendant's conduct, as outlined herein, is misleading, deceptive, unlawful and unfair to the members of the Class.   Consumers are induced into believing that Defendant's products are not defective, or that any defects have been corrected through the product safety recalls.   Class members have not received the value for which they bargained when they purchased Defendant's products.   As a result, Class members are left with RV's, boats, and refrigerators that are of diminished value and which they overpaid for, among other injuries and damages.

## G.   Dometic Actively Concealed And Suppressed The Ongoing Danger Presented By The Subject Refrigerators.

210.   Defendant has and continues to have actual knowledge that its Defective Gas Absorption Refrigerators contain defects that cause fires.   Despite knowledge of the defects and fire risks, Defendant continues to this day to market its gas absorption refrigerators on its website and through other materials, without mention of the defects and fire risks, while promoting itself as the world's gas absorption "specialist," that consumers "trust."   *See*, *Dometic*, DOMETIC,

---

[10]   *See* 49 C.F.R. § 573.6(b) ("Each report shall be submitted not more than 5 working days after a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist. At a minimum, information required by paragraphs (c)(1), (2), and (5) of this section shall be submitted in the initial report. The remainder of the information required by paragraph (c) of this section that is not available within the five-day period shall be submitted within 5 working days after the manufacturer has confirmed the accuracy of the information. In addition, each manufacturer shall amend information required by paragraphs (c)(2), (3), and (8)(i) or (ii) within 5 working days after it has new information that updates or corrects information that was previously reported. Each manufacturer submitting new information relative to a previously submitted report shall refer to the recall campaign number when a number has been assigned by the NHTSA.").

http://www.dometicgroup.com/en/Products/Dometic/ (last visited June 23, 2016). ("Dometic is still the absorption cooling specialist….The Dometic brand is today associated with market leadership, quality and innovation. People entrust their adventures to Dometic, the world leader in comfort").

211. Defendant's warranties pertaining to the Defective Gas Absorption Refrigerators are misleading and deceptive in that they tout its products as follows: "This warranty covers only specified parts (including the cooling unit) which shall be free from defects in material and workmanship under normal use," and "[c]ongratulations, and Thank You for purchasing the industry's best built and best backed RV Refrigerator" and also "[w]e at Dometic appreciate your business and are confident that you will have many years of trouble-free RV enjoyment."[11] Contrary to these statements, Defendant knows the defect exists at the point it places each Defective Gas Absorption Refrigerator and Defective Cooling Unit into the stream of commerce and that the recall kits were not designed to stop leaks.

212. Only recently did Dometic start to tell consumers complaining of cooling units that *already leaked*, and attempting to make a claim (or at least get an explanation), that the recall kit was never designed to prevent that problem and therefore, they were out-of-luck. Critically, any such disclosure was not made on a classwide basis and was not made at the time of purchase or any other time *in advance* of a leak or fire when it would have allowed consumers in the Class to make an informed choice on how best to protect themselves. Rather, it was only made *after* a consumer experienced a devastating leak or fire and Dometic was attempting to dodge responsibility for the damage and avoid paying a claim. By then, obviously, it was too late.

---

[11] *Installation and Operating Instructions*, DOMETIC, http://www.dometic.com/QBankFiles3/EPiServer/Dometic/US/Manuals/RV-manuals/Refrigerators/Dometic-DMR-DMC-Refrigerators-Manual-Web_29111.pdf (last visited June 23, 2016)

213.   Dometic also used its recalls as a way to conceal the true nature of the common design defect in its refrigerators by conveying a false sense of security to consumers and regulators that the recall and retrofit rendered its product safe to use.  Dometic, however, has actual knowledge that the retrofit was wholly inadequate to cure the defect – namely that it did nothing to prevent the corrosion and fatigue failure inherent in its cooling system.  Dometic's omissions regarding its recall result in consumers unknowingly continuing to use its defective product and putting them at risk of fire, property damage, injury, and/or death.

214.   Common omissions were made to Plaintiffs and Class members. Class members who did not receive a recall notice were not informed of the safety defect and Class members that did receive the notice were never informed that the retrofit would not fix the inherent design defect.   The recall notices did not disclose the safety defect at issue.

215.   Common omissions of material fact regarding the defects have been made to the Class by Defendant during the Class Period.   Had Defendant not concealed the material facts described above, which implicate safety concerns, Plaintiffs and the Class would have been aware of those facts, acted differently, and not been injured and damaged.

216.   As a result of Defendant's concealment and other actions outlined above, Plaintiffs and members of the Class that owned and/or own Defendant's gas absorption refrigerators have been misled by Defendant's omissions in purchasing, retaining, and/or using the refrigerators, believing them to be safe and suitable for their intended purpose.  Plaintiffs and members of the Class have further been misled by Defendant's omissions into believing that its refrigerators do not contain dangerous defects or potential risks or, if the refrigerators were part of a product safety recall by Defendant, that any defects or potential safety risks have been eliminated by Defendant's retrofit campaigns.

217.   In fact, Defendant's gas absorption refrigerators have never been, and are not, safe for their intended purpose in that Defendant has never eliminated the design and manufacturing defects that cause its products to ignite fires.  Plaintiffs reasonably relied upon Defendant's conduct described herein.  Defendant made material omissions regarding the defects, dangers, and hazards associated with the gas absorption refrigerators, information solely within Defendant's control, rendering it impossible for Plaintiffs and members of the Class to know the hazards associated with the gas absorption refrigerators they purchased.  As a result, Plaintiffs and members of the Class unknowingly continue to be put at risk of damage or injury through the use of Defendant's Defective Gas Absorption Refrigerator and Defective Cooling Units.

**H.     Dometic's Omissions Were Material To A Reasonable Consumer.**

218.   The design and manufacturing defects in Defendant's gas absorption refrigerators, Defendant's active concealment of those defects, and the inadequate safety recall/retrofit campaigns conducted by Defendant, created serious and unreasonable safety risks to consumers and users of Defendant's products, *i.e.* the risk of property damage and injury by fire.  These safety risks were and are material to a reasonable consumer, including Plaintiffs and members of the Class who own Defendant's products.  Had Defendant disclosed the true nature and scope of the safety risks inherent in the use of its product in the sales and marketing material provided to consumers along with the product, or with warnings prominently placed on the product, Plaintiffs, and all others similarly situated in the Class, would have been aware of the risks and acted differently, *i.e.* purchased a different recreational vehicle that did not contain Defendant's defective product; decided not to retain an RV with a Defective Gas Absorption Refrigerator; paid less for the recreational vehicle or refrigerator or cooling unit than at the inflated price ultimately paid because of the defective product contained in it or because of the cost of replacing the defective product with an

alternative, non-defective product (*e.g.*, an electrical refrigerator or another cooling unit that did not contain the same propensity to corrode and leak, such as those with thicker boiler tubes); and/or taken other action.

219. Defendant had actual and exclusive knowledge of the exact nature and scope of the defects in its products, the fire claim history of the products, and the fact that its recall and retrofit campaigns did not address or fully eliminate the defects. At all times, Dometic had a duty to disclose the safety risks inherent in the use of its product, and the inadequacies of its recall/retrofit campaigns to Plaintiffs, and to all members of the Class described herein. However, Defendant continually and actively concealed the true nature and scope of the defects, safety risks, and recall/retrofit inadequacies from Plaintiffs, and the members of the Classes described herein.

220. Reasonable consumers acting diligently cannot discover the defects at issue. The defective boiler tubes, safety plugs, and/or other parts of the Defective Cooling Units are not visible to the user of a Defective Gas Absorption Refrigerator when installed in an RV and used as intended. It was reasonably foreseeable to Defendant that its conduct and failure to act and warn the Class members, in light of the information it actually or should have possessed, would expose Plaintiffs and members of the Class to unreasonable risks of injury and loss and cause Plaintiffs and members of the Class damage, injury, and loss.

221. Defendant's above-described concealment of material facts regarding its gas absorption refrigerators and the ineffective, misleading, and fraudulent recall and retrofit campaigns Defendant has initiated, have injured and harmed, and continues to harm Class members in, *inter alia*, the following ways. *First*, by failing to disclose complete and accurate information regarding the nature and scope of the design and manufacturing defects in its products, Defendant has misled, and continues to mislead, consumers into the belief that Defendant's products are safe to use for their intended purpose, when in fact, said products

constitute a serious health and fire hazard. *Second*, Defendant's limited, misleading and ineffective recall and retrofit campaigns have created, and continue to create, the false impression to consumers that if they participate in the recall campaigns, their gas absorption refrigerators will be rendered safe to use, when in fact the retrofits used by Defendant are ineffective to prevent its products from causing fires; the defects inherent in the refrigerators will cause fires whether retrofitted or not.

## V. ACCRUAL OF CLAIMS, FRAUDULENT CONCEALMENT, AND EQUITABLE TOLLING

222. Defendant has knowingly sold Defective Gas Absorption Refrigerators and Defective Cooling Units that were defectively designed, would fail prematurely, and were not suitable for their intended use. At all relevant times, Defendant also knew that the design defects in its Defective Gas Absorption Refrigerators and Defective Cooling Units created and constituted a serious safety and fire hazard, and that its products were in fact causing fires in recreational vehicles on a regular basis for more than a decade, including during the Class Period and continuing through the present time. Further, at all times extending through the Class Period, Defendant knew that the design defects and safety hazards in its Defective Gas Absorption Refrigerators and Defective Cooling Units could be substantially decreased, if not totally eliminated, by the adoption of alternate designs and technology available in the market.

223. Notwithstanding Defendant's knowledge of the design defects and inherent safety risks in its Defective Gas Absorption Refrigerators and Defective Cooling Units, and its knowledge of alternate designs to eliminate the defects and safety hazards, Defendant failed and refused to alter its Defective Gas Absorption Refrigerators' and Defective Cooling Units' design. Instead, Defendant engaged in a continuous pattern of concealment and suppression of material facts, designed to mislead Plaintiffs and Class members into believing that the Defective Gas

Absorption Refrigerators and Defective Cooling Units they owned and used were safe.   In that the latent defects and safety risks to users of Defendant's refrigerators manifested themselves over time, and were not therefore readily apparent to the reasonable consumer, there was no way for consumers, including Plaintiffs and Class members, to discover the defects and safety risks of Defendant's products prior to suffering a devastating and dangerous leak except from Defendant itself.  Rather than provide consumers with complete and accurate information based on its exclusive and superior knowledge of the performance of its products, Defendant engaged in a continuing and consistent pattern and practice of deception and concealment, up to and through the Class Period, to mislead consumers into believing Defendant's products were defect-free and safe to use.  As a result, consumers had no knowledge of the true nature and extent of the safety risks involved in continuing to use Defendant's products.   By such actions and omissions of material fact, Defendant affirmatively concealed causes of action from Plaintiffs and members of the Class.

224.   Defendant had a continuous and ongoing duty to disclose material facts to Plaintiffs and the Class regarding the ongoing dangers of the Defective Gas Absorption Refrigerators and Defective Cooling Units, despite any retrofits, at all times before and during the Class Period.   Such disclosures should have been provided to Plaintiffs and Class members in the state in which they reside. Each day in which Defendant did not do this constitutes an actionable offense in the state in which the Plaintiff and Class members reside.   Defendant's failure to disclose all material facts to Plaintiffs and the Class prevented Plaintiffs and the Class from being able to discover the truth about the dangerous products, despite reasonable diligence, and to take further steps to protect themselves, their property, and to assert their rights.   As such, Plaintiffs' and each Class member's claims based on Defendant's omissions continue to accrue during the Class Period.

225.   The common omissions made by Defendant represent affirmative acts that were intended to prevent, and did in fact prevent, Plaintiffs and members of the Class from discovering their potential claims.  Because of the nature of concealment and the testing needed to discover the inherent defects in Defendant's gas absorption refrigerators, Plaintiffs and members of the Class could not, even with the exercise of due diligence, have independently discovered their causes of action.  Defendant exclusively possessed this information.

226.   Each Plaintiff and each Class member had a right to receive a full and complete disclosure from Defendant in his or her state of residence on each day during the Class Period that the Defective Gas Absorption Refrigerator he or she owned or otherwise possessed continued to present dangerous risks of fire despite any retrofit.  Defendant's failure to do this on each day during the Class Period was a separate actionable offense.

227.  Due to Defendant's ongoing and continuous concealment and deception, no reasonable consumer, including Plaintiffs, could have discovered the factual knowledge to assert these claims sooner.  Had Plaintiffs and the Class been provided all material facts regarding the refrigerator's inherent defects, risks, and safety hazards that Defendant exclusively possessed but omitted, withheld, and concealed from Plaintiffs and the Class, they would have been aware of the safety concerns present and acted differently, including but not limited to not purchasing (or retaining) a product equipped with a refrigerator/cooling unit containing the latent defects described within.

228.   As a result of Defendant's conduct, Plaintiffs and all Class members have been injured, incurred loss-of-money, and been damaged in a similar manner, in an amount which will be established at trial according to proof.

229.  Within the time period of any applicable statutes of limitation, Plaintiffs and the other Class members could not have discovered through the exercise of reasonable diligence that Defendant was failing to disclose defects and

that safety risks inherent in the Defective Gas Absorption Refrigerators remained. As such, discovery rule and/or equitable tolling apply.  Additionally, all applicable statutes of limitation have also been tolled by Defendant's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the Class Period.

230.   Based on this conduct and the allegations herein, Defendant is estopped from relying on any statute of limitations or other time-related defense in this action.  Defendant actively concealed the true nature, character, and quality of the gas absorption refrigerators and, for the reasons described herein, was under a continuous duty to disclose to Plaintiffs and the Class the facts it omitted and concealed.   Plaintiffs and the members of the Class reasonably relied upon Defendant's omissions (to the extent one can rely on statements not made) and active concealment and hence, could not bring the claims asserted herein sooner. As a result of Defendant's fraudulent concealment, equity requires that any statute of limitations on Plaintiffs' and the putative Class members' claims be tolled.

## VI.   INTENT

231.   Defendant knowingly and intentionally committed the acts, concealments and material omissions alleged herein.

232.   All actions and omissions by Defendant were willful and not the result of mistake or inadvertence.  At all times relevant, Defendant was aware of the defective nature of its gas absorption refrigerators.  Despite this, Defendant manufactured, marketed, and sold its Defective Gas Absorption Refrigerators and Defective Cooling Units as fit for their intended purpose.  Defendant knowingly and intentionally directed that its respective business undertake the illicit practices and conceal the material facts which are the subject of this suit.  Defendant's acts were motivated by a desire to avoid disrupting sales and to minimize its recall costs, as opposed to placing the safety and welfare of Plaintiffs and Class members first.

COMPLAINT

# VII.   CLASS ACTION ALLEGATIONS

## A.   Class Definitions

233.   Plaintiffs bring this action against Defendant pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated.  Plaintiffs seek to represent the following Class (the "Class"), which includes all Subclass members:

> All persons in California, Arizona, Delaware, New Jersey, Louisiana, Texas, Arkansas, Virginia, and New York who, during the Class Period, purchased or owned a Defective Gas Absorption Refrigerator or Defective Cooling Unit.

234.   Within the Class are the following State Subclasses:

### California

> By Plaintiffs Zimmer, Rich, and Arnold, on behalf of all persons in the state of California who, during the Class Period, purchased or owned a Defective Gas Absorption Refrigerator or Defective Cooling Unit.

### Arizona

> By Plaintiff Mitchell on behalf of all persons in the state of Arizona who, during the Class Period, purchased or owned a Defective Gas Absorption Refrigerator or Defective Cooling Unit.

### Delaware

> By Plaintiff Shoemaker on behalf of all persons in the state of Delaware who, during the Class Period, purchased or owned a Defective Gas Absorption Refrigerator or Defective Cooling Unit.

### New Jersey

> By Plaintiff Shoemaker on behalf of all persons in the state of New Jersey who, during the Class Period, purchased or owned a Defective Gas Absorption Refrigerator or Defective Cooling Unit.

### Louisiana

By Plaintiff Ortego on behalf of all persons in the state of Louisiana who, during the Class Period, purchased or owned a Defective Gas Absorption Refrigerator or Defective Cooling Unit.

### Texas

By Plaintiff Horner and Greene on behalf of all persons in the state of Texas who, during the Class Period, purchased or owned a Defective Gas Absorption Refrigerator or Defective Cooling Unit.

### Arkansas

By Plaintiff Jackson on behalf of all persons in the state of Arkansas who, during the Class Period, purchased or owned a Defective Gas Absorption Refrigerator or Defective Cooling Unit.

### Virginia

By Plaintiff Sadler on behalf of all persons in the state of Virginia who, during the Class Period, purchased or owned a Defective Gas Absorption Refrigerator or Defective Cooling Unit.

### New York

By Plaintiff Haisch on behalf of all persons in the state of New York who, during the Class Period, purchased or owned a Defective Gas Absorption Refrigerator or Defective Cooling Unit.

235. The "Class Period" for the Class and each Subclass dates from January 1, 2001 and continues through the present and the date of judgment, or alternatively, the length of the longest applicable statute of limitations for any claim asserted on behalf of that Class. Excluded from the Class are: (a) any officers, directors or employees of Defendant; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court; (d) any juror selected to hear this case; and, (e) anyone who has suffered

personal injury as a result of a fire caused by a Defective Gas Absorption Refrigerator.  Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

236.  All requirements for class certification in Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2) and/or 23(b)(3) (or any other applicable state or federal rule of civil procedure) are satisfied with respect to the Class.  Defendant subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.  All Plaintiffs suffered actual loss at the point of sale by overpaying for their Defective Gas Absorption Refrigerator and/or Defective Cooling Unit.

**B.    Fed. R. Civ. P. 23(a) is Satisfied.**

237.  **Numerosity**: The proposed classes are so numerous that joinder of all members would be impracticable.  Defendant manufactured, sold, and installed tens of thousands of Defective Gas Absorption Refrigerators and Defective Cooling Units in this state during the Class Period.  The precise number of Class members is at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

238.  **Ascertainability:** The community of interest among Class members in the litigation is well-defined and the proposed Class is ascertainable from objective criteria. If necessary to preserve the case as a class action, the court itself can redefine the Class and create additional Subclasses, as may be necessary.

239.  Membership in the Class is readily determinable by reference to Defendant's manufacturing databases, warranty registration databases, aftermarket sales databases, recall/retrofit campaign mailing lists and databases, OEM's manufacturing and sales records, dealership sales records, and, if necessary, license and registration databases of applicable states.

240.   **Typicality:** Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the other Class members.  Plaintiffs and other Class members all purchased or owned an RV or boat that contained a Defective Gas Absorption Refrigerator and Defective Cooling Unit without notice of the continuing nature of the defect and safety risks.  All Plaintiffs suffered actual loss at the point of sale by overpaying for their Defective Gas Absorption Refrigerator and/or Defective Cooling Unit.   All Class members overpaid because a defective refrigerator presenting safety risks is worth less than a refrigerator without such defects. Reasonable consumers would have wanted to know the concealed facts when making a purchasing decision. Plaintiffs and the members of the Class have all sustained injury in that: (1) their Defective Gas Absorption Refrigerators and Defective Cooling Units are defectively designed and present an unreasonable risk of fire; (2) they all suffered  loss at the point of sale by overpaying for their Defective Gas Absorption Refrigerator and/or Defective Cooling Unit at an inflated price; (3) they are now required to pay additional sums to repair or replace their Defective Gas Absorption Refrigerators; and (4) the value of their refrigerators and/or RV's has decreased due to Defendant's wrongful conduct.

241.  **Adequacy of Representation:** Pursuant to Rules 23(a)(4) and 23(g)(1), Plaintiffs are adequate representatives of the Class(es) they seek to represent and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, identified below, who are experienced in litigation of this nature, to represent them.   There is no hostility between Plaintiffs and the unnamed Class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

**C.     Fed. R. Civ. P. 23(b)(1) & (2) are Satisfied.**

242.    One of the predominant remedies sought in this case is injunctive and declaratory in nature, in the form of the provision of conspicuous notice to the Class members of the ongoing defect and safety risks in their product.

243.    Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

244.    Pursuant to Rule 23(b)(2), Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.  In particular, Defendant has concealed the true nature of the defects in the Defective Gas Absorption Refrigerators and Defective Cooling Units and has failed to properly repair the Defective Gas Absorption Refrigerators and Defective Cooling Units.  Instead, it initiated recall and retrofit campaigns that fail to address the underlying defects in the Defective Gas Absorption Refrigerators and Defective Cooling Units and fail to alleviate the risk of fire.

**D.     Fed. R. Civ. P. 23(b)(3) is Satisfied.**

245.    **Common Questions of Law or Fact Exist and Predominate Over Individual Issues:** Pursuant to Rule 23(a) (2) and 23 (b)(3), common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members thereof.   Among the common questions of law and fact are as follows:

   a.  Whether Defendant's Defective Gas Absorption Refrigerators and Defective Cooling Units contained within them have defects that create an unreasonable risk of leaks of flammable and noxious materials and fire under normal use and within their expected useful lifespan;

b. Whether Defendant had knowledge of the defects in the Defective Gas Absorption Refrigerators and Defective Cooling Units;

c. Whether Defendant concealed the defects in the Defective Gas Absorption Refrigerators and Defective Cooling Units;

d. Whether Defendant had a duty to disclose material facts to the Class about the defects in the Defective Gas Absorption Refrigerators and Defective Cooling Units;

e. Whether installation of the Thermo Disc, Thermal Fuse, and/or other parts satisfied Defendant's warranty obligations with respect to the Defective Gas Absorption Refrigerators and Defective Cooling Units;

f. Whether Defendant's omissions regarding the Defective Gas Absorption Refrigerators and Defective Cooling Units were likely to deceive reasonable consumers;

g. Whether Defendant's business practices, including the manufacture and sale of the Defective Gas Absorption Refrigerators and Defective Cooling Units that Defendant has failed to adequately investigate, disclose, and remedy, offend established public policy and cause harm to consumers that greatly outweighs any benefits associated with those practices;

h. Whether Defendant violated the requirements of the Safety Act;

i. Whether due to the material facts that were concealed, Plaintiffs and Class members overpaid for their Defective Gas Absorption Refrigerators and Defective Cooling Units at the point of sale and did not receive the benefit of their bargain;

j. Whether Plaintiffs and Class members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief;

k. The amount and nature of such relief to be awarded to Plaintiffs and

the Class; and

l. Whether any applicable statutes of limitations should be tolled due to Defendant's concealment of the defects in the Defective Gas Absorption Refrigerators and Defective Cooling Units.

246. **Superiority:** Pursuant to Rule 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.

247. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendant, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

## VIII. CAUSES OF ACTION

### COUNT I
**Violation of the California Legal Remedies Act,
California Civil Code § 1780 *et seq.*
(on behalf of the California Subclass)**

248. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though fully stated herein.

249. This claim is based on Defendant's deceptive and misleading conduct, based on common omissions of material fact, in violation of the California Legal Remedies Act, Cal. Civ. Code § 1780 *et seq.* ("CLRA").

250. Each California Plaintiff, Zimmer, Rich, and Arnold, and each proposed California Subclass member is a consumer, purchaser, or other person entitled to the protection of the CLRA as they purchased and/or owned one or more of Defective Gas Absorption Refrigerators or Defective Cooling Units, either as separate products, or as installed in recreational vehicles, for personal, family, or household purposes.

251.   Dometic's Defective Gas Absorption Refrigerators and Defective Cooling Units are goods, products, consumer goods, merchandise, property, and/or assets as those terms are defined under the CLRA.

252.   All Plaintiffs and California Subclass members suffered actual loss at the point of sale by overpaying for their Defective Gas Absorption Refrigerator or Defective Cooling Unit.

253.   Each Defective Gas Absorption Refrigerator and Defective Cooling Unit owned by California Subclass members contains an inherent defect, which is susceptible to leak and release flammable and noxious materials during the useful life of the product when used as reasonably anticipated and intended.

254.   Each Defective Gas Absorption Refrigerator and Defective Cooling Unit owned by California Subclass members contains an inherent defect, which presents an unreasonable safety risk to Class members when used as reasonably anticipated and intended.

255.   There have been thousands of leaks in Defective Gas Absorption Refrigerators and Defective Cooling Units as a result of the common defect. Leaks and fires continue to occur in units that have had the recall kit installed because it is not designed to stop leaks.  Material facts regarding the continuing presence of the defect and ineffectiveness of the recall kit to stop leaks are not disclosed by Dometic to California Subclass members.  Such conduct violates Dometic's duty to disclose and is deceptive, misleading, unfair, and unlawful.

256.   The defects are latent, meaning they that could not have been discovered by a reasonably thorough inspection before the sale (or thereafter). The leaks at issue are microscopic and develop from the inside out, so consumers acting reasonably cannot reasonably discover them until it is too late and a leak or fire occurs.

257.   Defendant knew of the latent defects and safety risks presented yet failed to notify California Subclass members of those material facts.

258.   By manufacturing, marketing, and distributing for sale the Defective Gas Absorption Refrigerators, Defendant engaged in trade or commerce, the sale of goods, and/or practices affecting commerce.

259.   By failing to disclose and concealing the defective nature of the gas absorption refrigerators from Plaintiffs and California Subclass members, Defendant has engaged in deceptive, unfair, fraudulent, and misleading acts and practices in connection with consumer transactions, as Defendant has represented that its refrigerators had characteristics and benefits that they do not have, and represented that its refrigerators were of a particular standard, quality or grade when they were of a lesser standard, quality, or grade.

260.   Defendant knew that its Defective Gas Absorption Refrigerators were defectively designed, were at risk of fail prematurely, and were not suitable for their intended use.  Defendant also knew that the design defects in its gas absorption refrigerators created and constituted a serious and unreasonable safety and fire hazard.   Further, Defendant knew that the design defects and safety hazards in its gas absorption refrigerators could be substantially decreased, if not totally eliminated, by the adoption of alternate designs readily available in the market.

261.   Notwithstanding Defendant's knowledge of the design defects and inherent safety risks in its gas absorption refrigerators, and its knowledge of alternate designs to eliminate the defects and safety hazards, Defendant failed and refused to alter its gas absorption refrigerator design, and instead engaged in a continuous pattern of deception and concealment, designed to mislead Plaintiffs and California Subclass members into believing that its gas absorption refrigerators were safe, when in fact they were, and continue to be, dangerously defective.   Defendant's records show that leaks and fires continue to occur through the present.

262.   Defendant, at all times up to the filing of this Complaint, has engaged in a pattern of concealment and misrepresentation designed to mislead Plaintiffs and all members of the California Subclass into believing that the refrigerators they owned were either free of defects, or that any defects had been fully and completely eliminated through Defendant's retrofit campaigns.   As a result of Defendant's concealment and misrepresentation, Plaintiffs did not know, and could not through the exercise of reasonable diligence be expected to know, of the defects and safety risks involved in their use of Defendant's products, or of Defendant's fraudulent, unlawful, and unfair conduct, as outlined above.

263.   Through the above-described omissions, Defendant has engaged in deceptive and misleading business practices in violation of the Cal. Civ. Code § 1770 (a) (2), (3), (5), (7), (14) and (16) by:

    a.  Misrepresenting by omission that the gas absorption refrigerators at issue have characteristics, uses, benefits, and qualities which they do not have;

    b.  Misrepresenting by omission that the gas absorption refrigerators at issue are of a particular standard, quality, and grade when they are not;

    c.  Misrepresenting by omission that a transaction involving the gas absorption refrigerators at issue confers or involves rights, remedies, and obligations which it does not;

    d.  Misrepresenting by omission that the subject of a transaction involving the gas absorption refrigerators at issue has been supplied in accordance with a previous representation when it has not;

    e.  Failing to disclose the dangerous safety defect inherent in the gas absorption refrigerators at issue when that was a material fact reasonable consumers would want to know about; and

f. Failing to promptly notify the Class of the defect and risks, as required by the Safety Act and/or other law.

264. Despite reasonable diligence, neither Plaintiffs, California Subclass members, nor any other reasonable consumer acting in the ordinary course of use, could learn the facts Defendant knowingly concealed from the general public. The defective Cooling Unit and boiler tubes which may develop microscopic cracks are not readily apparent or visible to California Subclass members using the refrigerators as intended in the ordinary course. The only time a leak or fire risk becomes apparent is at the time it occurs and flammable and noxious material escapes, creating safety risks, including the risk of fire and injury. By that time, it is too late for Plaintiffs and California Subclass members, like other reasonable consumers, to take practical steps to protect themselves and their property from fire danger.

265. Defendant's unfair and deceptive acts and/or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

266. Defendant knew that its gas absorption refrigerators were defectively designed and/or manufactured, were susceptible to fail prematurely, and were not fit for their intended purpose. Despite this, Defendant marketed and sold these products to the California Subclass members for financial gain.

267. Defendant was under an ongoing and continuous duty to Plaintiffs and the California Subclass members to disclose the defective nature of its refrigerators because:

a. Defendant was in a superior position to know the true state of facts about the safety defects in its gas absorption refrigerators;

b. Plaintiffs and California Subclass members could not reasonably have been expected to learn or discover that the refrigerators had dangerous safety defects until they externally manifested failure;

c. Defendant knew that Plaintiffs and California Subclass members could not reasonably have been expected to learn or discover the safety defects in their refrigerators; and

d. The Safety Act requires disclosure of safety defects for a period of at least 10 years.

268. As described herein, Defendant has engaged in consumer-oriented conduct that was materially misleading and generally directed at the consuming public.

269. Proof of individual reliance or individual injury on the part of absent Subclass members is not required to establish a basis for relief under the consumer protection statutes Plaintiffs seek to apply. Further, Plaintiffs' claims are based on omissions of material fact. Materiality is an objective test established on a classwide basis. Plaintiffs do not base their claims on any affirmative misrepresentations by Defendant, including language and statements contained in Defendant's recall notices, warranties and other materials identified herein.

270. To the extent that reliance is required for relief under any of the consumer protection statutes Plaintiffs seek to apply, Plaintiffs did reasonably and justifiably rely on Defendant's omissions and failures to disclose the existence of the defect in deciding to purchase their Dometic product. Had Defendant disclosed the defect, Plaintiffs would have been aware of that disclosure prior to making their purchase. Had Defendant disclosed the defect, Plaintiffs would have behaved differently, including not purchasing the product or paying less for the product. It is proper to presume reliance on the part of Plaintiffs and California Subclass members due to Defendant's omissions and concealment of material facts. Reasonable consumers would expect to be warned by a product's

manufacturer of all facts regarding serious and unreasonable dangers, as exist here.  Defendant deliberately withheld information from the California Subclass members that severe fires could result from the use of Defendant's gas absorption refrigerators, which could cause serious bodily harm or death.  Given the severity of the consequences which Defendant failed to disclose, the materiality of such an omission cannot be questioned.

271.  It was possible for Defendant to disclose nature of the defect and safety risks to California Subclass members by *inter alia*, attaching a conspicuous warning label or permanent badge to the refrigerator itself.  It was also possible to disclose nature of the defect and safety risks to California Subclass members through the means used in the recall campaigns.  Had Defendant done that, Plaintiffs and the California Subclass would have been aware of the defect and risks at the time of sale and during use.

272.  In failing to disclose the defects in its product, Defendant knowingly and intentionally concealed material facts from Plaintiffs and the California Subclass members and breached its duties not to do so.

273.  The facts concealed or not disclosed by Defendant to Plaintiffs and members of the California Subclass are material in that reasonable consumers would have considered them to be important in deciding whether to purchase (or retain) Defendant's Defective Gas Absorption Refrigerators and Defective Cooling Units, or pay a lesser price.  Had Plaintiffs and the California Subclass members known of true extent of the defective nature of Defendant's products, they would not have purchased (or retained) the products, or would have paid less for them.

274.  Plaintiffs and California Subclass members reasonably expected that Defendant's gas absorption refrigerators would function properly and would not be susceptible to the hazards described herein for the life of their recreational

vehicles. That is the reasonable and objective consumer expectation for gas absorption refrigerators.

275. Plaintiffs purchased RV's with Defective Gas Absorption Refrigerators and Defective Cooling Units with the understanding that the products were not defective, and would function safely and without unreasonable risk of fire when sold. Defendant had specific and exclusive information about dangerous defects in the refrigerators that affected their ability to function as warranted, and it did not disclose that material information to Plaintiffs and the California Subclass but instead concealed such information. Defendant has had multiple opportunities to disclose the full truth about the defects and the continuing fire risks to Plaintiffs and the California Subclass but has failed to do so.

276. Defendant's deceptive and misleading conduct, described above, presents a continuing threat to Plaintiffs, the members of the California Subclass, and to the general public. Unless enjoined, Defendant will continue to place dangerously defective gas absorption refrigerators into the stream of commerce, and will continue to conceal and mislead consumers regarding the inherent defects and safety risks associated with use of the products. Unless enjoined, Defendant will continue to conceal and mislead owners of its gas absorption refrigerators into believing that its products are safe, or that any risks have been completely eliminated through Defendant's ineffective recall and retrofit campaigns. Such conduct presents a continuing threat to owners of Defendant's products, in that they will be unknowingly exposed to serious safety risks through the continued use of Defendant's product, including the risk of property damage, injury and death. Defendant's conduct also presents a continuing risk to members of the public in that the risk of property damage, injury, and death by fire extends beyond the owners of Defendant's products. Injunctive and declaratory relief is therefore appropriate and necessary to warn and eliminate a serious safety risk to

Plaintiffs, the Class, and members of the general public. Proper notice of the defect and safety warning should be provided.

277.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiffs and California Subclass members have suffered and will continue to suffer actual damages in the form of diminished value for their RV's and refrigerators.   Plaintiffs and California Subclass members were misled into purchasing and owning dangerously defective gas absorption refrigerators that cannot be used safely for their intended purpose, and which therefore need to be replaced.  Defendant has failed and refused, and continues to fail and refuse, to acknowledge its responsibility for placing dangerously defective products into the stream of commerce, and has further failed and refused to eliminate the defects and render its products safe to use.  Through its wrongful conduct as described above, Defendant has foisted the responsibility – and the costs – of manufacturing a safe product, or rendering its defective product safe, onto Plaintiffs and California Subclass members.  The resulting damage and injury is common to all Plaintiffs and California Subclass members, and can only be adequately remedied through the common, class-wide relief sought herein.

278.   Plaintiffs and the California Subclass members are entitled to legal and equitable relief against Defendant, including injunctions, actual damages, rescission, restitution, attorneys' fees, costs of suit, prejudgment interest, and other relief as appropriate.

279.   To the extent required, Plaintiffs have provided Defendant pre-filing notice under each of the consumer protection acts that require such notice and/or limited their claims.  With respect to claims asserted under the CLRA, by letter dated June 16, 2016 and August 9, 2017, mailed as directed in California Civil Code § 1782, Plaintiffs notified Defendant of its violations of the CLRA and demanded that Defendant provide a remedy that rectifies its misconduct.  As of the filing of this Complaint, Defendant has not rectified its actions on a classwide

basis. Therefore, pursuant to Civil Code § 1782(c), Plaintiffs, on behalf of themselves and any Class members, seek damages in addition to their claims for injunctive and other equitable relief under California Civil Code § 1780(a) and (d).

**COUNT II**
**Violation of California Unfair Competition Law,**
**California Business and Professions Code § 17200** *et seq.*
**(on behalf of the California Subclass)**

280. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as though stated herein.

281. The California Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." The UCL declares that any act or business practice that is forbidden by law is unlawful and a violation of the UCL.

282. Each California Plaintiff and proposed Subclass member is a consumer, purchaser, or other person entitled to the protection of the above-described consumer protection laws.

283. Plaintiffs suffered both injury-in-fact and lost money as a result of Defendant's conduct and practices which are described herein and challenged. Each Plaintiff and California Subclass member was overcharged for the Defective Gas Absorption Refrigerator and Defective Cooling Unit they purchased and/or received products that were not worth what they paid, losing the benefit of their bargain.

284. Separate from any restitution that may be due, Plaintiffs and the California Subclass members are entitled to injunctive and declaratory relief, including but not limited to the provision of safe products (replacement cooling units) and proper, complete, and conspicuous notification of the nature of the defect and continuing safety risks even after the recall.

285.   Defendant's conduct, as described above, constitutes unlawful, unfair and fraudulent practices under the UCL.

286.   Defendant's unlawful practices include, but are not limited to violations of:

    a.   Cal. Civ. Code § 1770 (a) (2), (3), (5), (7), (14) and (16); and,

    b.   the Safety Act, including the requirement to promptly notify NHTSA and Class members of the true nature of the defect and risks faces.

287.   Defendant committed unfair and/or fraudulent business practices by the deceptive and misleading acts alleged herein, including, but not limited to:

    a.   Designing, manufacturing, assembling, marketing, distributing, selling and otherwise placing into the stream of commerce dangerously defective gas absorption refrigerators that posed serious safety risks to users of the product and members of the general public;

    b.   Making material omissions which led consumers to believe that Defendant's gas absorption refrigerators were free from defects, when in fact Defendant knew that they contained design defects, even after recall and/or retrofitting, that created a substantial risk of fire, injury and death when the product was used for its normally intended purpose, as well as the release of noxious materials;

    c.   Conducting repeated manufacturer-initiated recall and retrofit campaigns that were intentionally misleading in an effort to minimize and conceal the nature and scope of the defects and continuing risks in Defendant's products, including the ongoing serious safety risks arising from said defects;

    d.   Conducting retrofit campaigns to install various devices onto Defendant's gas absorption refrigerators that did not address the

defects at all, or the propensity of the defects to leak, cause, and/or enhance fires, and release noxious chemicals – material facts omitted;

e.  Concealing the fact that the retrofit devices installed on Defendant's products were not only ineffective to stop leaks and fires, but were in fact designed by Defendant to turn its defective products into a new source of profits by rendering its refrigerators unrepairable, thereby requiring consumers to purchase – at their cost – another of Defendant's gas absorption refrigerators to replace the initial one.

f.  Putting its profits and desire to save costs ahead of the safety interests and concerns of Plaintiffs and the California Subclass in having safe products that were not prone to unexpected and suddenly leak, ignite, or release noxious fumes – especially in a product that is expected to be traveled in, and slept in, and even lived in by families with children and members of the senior citizen community, which comprises a significant share of RV owners and Defendant's intended end-users.

288.  Defendant knew that its gas absorption refrigerators were defectively designed, would fail prematurely, and were not suitable for their intended use. Defendant also knew that the design defects in its gas absorption refrigerators created and constituted a serious safety and fire hazard.  Further, Defendant knew that the design defects and safety hazards in its gas absorption refrigerators could be substantially decreased, if not totally eliminated, by the adoption of alternate refrigerator and cooling unit designs readily available in the market, including but not limited to, cooling units with thicker boiler tubes, helium gas, or residential-style refrigerator technology with inverters.

289.  Notwithstanding Defendant's knowledge of the design defects and inherent safety risks in its gas absorption refrigerators, and its knowledge of alternate designs to eliminate the defects and safety hazards, Defendant failed and

refused to alter its gas absorption refrigerator design, and instead engaged in a continuous pattern of deception and concealment, designed to mislead Plaintiffs and other consumers including those in the California Subclass, into believing that its gas absorption refrigerators were safe, when in fact they were, and continue to be, dangerously defective, posing continuing safety risks.

290.   Defendant, at all times up to the filing of this Complaint, has engaged in a pattern of concealment designed to mislead Plaintiffs and all members of the California Subclass into believing that Defendant's refrigerators they owned were either free of defects, and/or that any defects had been fully and completely eliminated through Defendant's retrofit campaigns.  As a result of Defendant's concealment, Plaintiffs did not know, and could not through the exercise of reasonable diligence be expected to know, of the latent defects and safety risks involved in their use of Defendant's products, or of Defendant's deceptive, fraudulent, unlawful, and unfair conduct, as outlined above.

291.  Plaintiffs and all members of the California Subclass reasonably expected Defendant's gas absorption refrigerators to function properly for the expected useful life of their recreational vehicles without presenting safety risks.

292.  Defendant's   sale   of   dangerously   defective   gas   absorption refrigerators, its failure to eliminate the design defects and safety hazards inherent in said products, and its pattern of deception and concealment of said defects and risks, did not have any legitimate utility, and even if it did, the utility was substantially   outweighed   by   the   grave   consequences   such   conduct   exposed Plaintiffs and members of the Class to, *i.e.* the risk of fire and the potential for serious property damage, personal injury, and death.

293.  Defendant's conduct as alleged herein, was immoral, unethical, oppressive, unscrupulous, and unfair in violation of public policy and substantially injurious to Plaintiffs in the California Subclass, and constituted violations of the various consumer protection statutes outlined above.

294.    Plaintiffs and other members of the California Subclass relied on Defendant's actions and conduct (including, to the extent possible, Defendant's omissions of material fact and conduct failing to disclose material facts regarding product defects and risks), and believed that they were receiving gas absorption refrigerators that were free from or cured of any defects.  Had Plaintiffs and Subclass members been informed of the material information concealed by Defendant, like reasonable consumers, they would have acted differently and not purchased or retained their Defective Gas Absorption Refrigerators and Defective Cooling Units.

295.    Plaintiffs and other members of the California Subclass have suffered injury in fact and lost money and property as a result of Defendant's unlawful, unfair and/or fraudulent practices, in that, among other things, economic damages including:

    a.  The cost of any repairs, service, modifications, and retrofitting necessary to allow their gas absorption refrigerators to be operated safely without risk and/or potential for fire;

    b.  Plaintiffs and members of the California Subclass have been and/or will be subject to further economic damage through the loss of use of their recreational vehicles while Defendant's defective products are being rendered safe to use, or replaced;

    c.  Plaintiffs and members of the California Subclass have been deprived of making an informed decision about the recreational vehicle they purchased; and,

    d.  The recreational vehicles purchased by Plaintiffs and members of the California Subclass are worth less in the marketplace as a result of Defendant's conduct.

296.    Plaintiffs and members of the California Subclass would not have purchased or retained Defendant's gas absorption refrigerator, or a recreational

vehicle equipped with one, had they known the truth, and are thus entitled to a full or partial refund as allowed under the laws alleged herein.

297. Defendant's unlawful, unfair, and fraudulent conduct, described above, presents a continuing threat to Plaintiffs, the members of the California Subclass, and to the general public. The risk of fire and/or other damage in the Defective Gas Absorption Refrigerators remains, regardless of whether the unit has been recalled and subjected to any retrofit. Unless enjoined, Defendant will continue to place dangerously defective gas absorption refrigerators into the stream of commerce, and will continue to conceal and mislead consumers regarding the inherent defects and safety risks associated with use of the product. Unless enjoined, Defendant will continue to conceal and mislead owners of its Defective Gas Absorption Refrigerators into believing that its products are safe, or that any risks have been completely eliminated through Defendant's fraudulent and ineffective recall and retrofit campaigns. Such conduct presents a continuing threat to owners of Defendant's products, in that they will unknowingly be exposed to serious safety risks through the continued use of Defendant's products, including the risk of property damage, injury, and death. Defendant's conduct also presents a continuing risk to members of the public in that the risk of property damage, injury, and death by fire extends beyond the owners of Defendant's products, to anyone living next door, camping in the same campground, or driving on the same highway as an owner of a recreational vehicle containing one of Defendant's Defective Gas Absorption Refrigerators. Injunctive relief is therefore appropriate and necessary to eliminate a serious safety risk to Plaintiffs, all members of the California Subclass, and the general public.

298. Accordingly, Plaintiffs and members of the California Subclass seek an injunction that requires Defendant to immediately cease the unfair, unlawful, and fraudulent business acts alleged herein, and to immediately take all necessary actions to cure the design and/or manufacturing defects inherent in its gas

absorption refrigerators so that the refrigerators can be designed and manufactured, and/or effectively retrofitted, to operate safely. Plaintiffs further seek an order that Defendant establish a warranty program to provide the Plaintiffs and each Subclass member with a non-defective gas absorption refrigerator, and that Defendant pay all costs associated with the warranty program, including, but not limited to, all labor and material costs involved in removing and replacing Defendant's Defective Gas Absorption Refrigerators in Plaintiffs' and California Subclass members' RV's. Plaintiffs also seek restitution and all other appropriate relief on behalf of all members of the California Subclass.

299. Immediate notification of the concealed facts is necessary and proper to allow Plaintiffs and California Subclass members to best protect themselves.

## COUNT III
### Violation of Arizona Consumer Fraud Act,
### Ariz. Rev. Stat. § 44-1521 *et seq.*
### (on behalf of the Arizona Subclass)

300. Plaintiffs incorporate by reference each allegation set forth above.

301. This cause of action is brought pursuant to the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521 *et seq.* ("ACFA") because Defendant's actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

302. Plaintiff Mitchell and the members of the Arizona Subclass are each a "person" as defined in § 14-1521 of the ACFA.

303. The ACFA broadly prohibits deceptive and misleading practices.

304. The ACFA proscribes the following conduct: "The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or

advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." Ariz. Rev. Stat. § 44-1522(A).

305.   The Defective Gas Absorption Refrigerators are merchandise within the meaning of ACFA, defining "merchandise" as any object, wares, goods, commodities, intangibles, real estate or services. Ariz. Rev. Stat. § 44-1521.

306.   As described herein, Defendant violated ACFA by engaging in unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce.

307.   By failing to disclose and concealing the defective nature of the gas absorption refrigerators from Plaintiff and Arizona Subclass members, Defendant has engaged in deceptive, unfair, fraudulent, and misleading acts and practices in connection with consumer transactions, as Defendant has represented that its refrigerators had characteristics and benefits that they do not have, and represented that its refrigerators were of a particular standard, quality or grade when they were of a lesser standard, quality, or grade.

308.   Defendant knew that its Defective Gas Absorption Refrigerators and Defective Cooling Units were defectively designed, were at risk of failing prematurely, and were not suitable for their intended use. Defendant also knew that the design defects in its Defective Gas Absorption Refrigerators created and constituted a serious and unreasonable safety and fire hazard.  These risks should have been disclosed instead of concealed so consumers could make an informed purchasing decision. Further, Defendant knew that the design defects and safety hazards in its Defective Gas Absorption Refrigerators could be substantially decreased, if not totally eliminated, by the adoption of alternate designs readily available in the market.

309.   Notwithstanding Defendant's knowledge of the design defects and inherent safety risks in its Defective Gas Absorption Refrigerators, and its knowledge of alternate designs to eliminate the defects and safety hazards,

Defendant failed and refused to alter its gas absorption refrigerator design, and instead engaged in a continuous pattern of deception and concealment, designed to mislead Plaintiff and members of the Arizona Subclass into believing that its gas absorption refrigerators were safe, when in fact they were, and continue to be, dangerously defective. Defendant's records show that leaks and fires continue to occur through the present.

310.   Defendant, at all times up to the filing of this Complaint, has engaged in a pattern of concealment and misrepresentation designed to mislead Plaintiff and members of the Arizona Subclass into believing that the refrigerators they owned were either free of defects, or that any defects had been fully and completely eliminated through Defendant's retrofit campaigns.  As a result of Defendant's concealment and misrepresentation, Plaintiff did not know, and could not through the exercise of reasonable diligence be expected to know, of the defects and safety risks involved in their use of Defendant's products, or of Defendant's fraudulent, unlawful, and unfair conduct, as outlined above.

311.   Through the above-described omissions, Defendant has engaged in deceptive and misleading business practices including, but not limited to:

    a.  Misrepresenting by omission that the gas absorption refrigerators at issue have characteristics, uses, benefits, and qualities which they do not have;

    b.  Misrepresenting by omission that the gas absorption refrigerators at issue are of a particular standard, quality, and grade when they are not;

    c.  Misrepresenting by omission that a transaction involving the gas absorption refrigerators at issue confers or involves rights, remedies, and obligations which it does not;

    d.  Misrepresenting by omission that the subject of a transaction involving the gas absorption refrigerators at issue has been supplied

in accordance with a previous representation when it has not;

e.  Failing to disclose the dangerous safety defect inherent in the gas absorption refrigerators at issue when that was a material fact reasonable consumers would want to know about; and

f.  Failing to promptly notify the Class of the defect and risks, as required by the Safety Act and/or other law.

312.  The above-described deceptive and/or unfair acts were perpetrated by Defendant with the intent for Plaintiff and members of Arizona Subclass to rely on the deception in order maximize revenue. Defendant's conduct offends public policy and caused substantial injury to consumers.

313.  Defendant knew, or should have known, that its omissions of facts concerning safety risks were material to reasonable consumers like those in the Arizona Subclass. Reasonable consumers would expect to be warned by a product's manufacturer of all facts regarding serious and unreasonable dangers, as exist here.   Defendant deliberately withheld information from the Arizona Subclass that severe fires could result from the use of Defendant's gas absorption refrigerators, which could cause serious bodily harm or death.  Given the severity of the consequences which Defendant failed to disclose, the materiality of such an omission cannot be questioned. The facts concealed or not disclosed by Defendant to Plaintiff and members of the Arizona Subclass are material in that reasonable consumers would have considered them to be important in deciding whether to purchase (or retain) Defendant's Defective Gas Absorption Refrigerators and Defective Cooling Units, or pay a lesser price.   Had Plaintiff and the Arizona Subclass members known of true extent of the defective nature of Defendant's products, they would not have purchased (or retained) the products, or would have paid less for them.

314.  By way of the foregoing, Plaintiff Mitchell and members of the Arizona Subclass have sustained actual damages as a direct and proximate result

of Dometic's unfair, deceptive, and unconscionable practices. Plaintiffs and members of the Arizona Subclass would not have purchased a Defective Gas Absorption Refrigerator had they known about the defect, or they would have paid less for a gas absorption refrigerator had they known.

315.   Defendant's conduct has caused Plaintiff Mitchell and the members of the Arizona Subclass to suffer damages an ascertainable loss by receiving less than what was promised. Specifically, the dangerous defect inherent in each Defective Gas Absorption Refrigerator renders it valueless to consumers, who paid between $1,400-$2,350.00, on average, based on advertised retail prices and/or Defendant's price lists.[12]

316.   Plaintiff also paid a premium for a safe and defect free refrigerator and/or cooling unit. Consumer surveys and analyses can empirically quantify the monetary value of a refrigerator containing the Defect as compared to the safe and defect free refrigerator that Plaintiff and Arizona Subclass members paid for. Plaintiff and members of the Arizona Subclass would not have paid this quantifiable price premium had they known the true extent of the defective nature of the Defective Gas Absorption Refrigerator and Defective Cooling Unit.

317.   In addition to the price premium and lost benefit of the bargain, Plaintiff and Arizona Subclass members will incur additional expenses in the form of repair and replacement costs necessary to remediate the safety risk inherent in each Defective Gas Absorption Refrigerator.

318.   Based on the foregoing, Plaintiff Mitchell and the members of the Arizona Subclass are entitled to actual damages, declaratory and injunctive relief, as well as all other relief deemed just and equitable and allowable by law or equity.

---

[12] *See, e.g.*, RV Parts Country, Dometic Refrigerators http://www.rvpartscountry.com/DometicRefrigerators (last visited Sept. 11, 2017).

## COUNT IV
### Violation of the Delaware Consumer Fraud Act,
### Del. Code Ann. tit. 6 § 2511 *et seq.*
### (on behalf of the Delaware Subclass)

319.   Plaintiffs incorporate by reference each allegation set forth above.

320.   This cause of action is brought pursuant to the Del. Code Ann. tit. 6 § 2511 *et seq.* ("DCFA") because Defendant's actions and conduct described herein constitute transactions that have resulted in the sale or lease of merchandise to consumers.

321.   Plaintiff Shoemaker and the members of the Delaware Subclass are each a "person" as defined by Del. Code Ann. tit. 6, § 2511(7). Defendant is a person as defined by Del. Code Ann. tit. 6, § 2511(7), and the Defective Refrigerators are merchandise as defined by Del. Code Ann. tit. 6, § 2511(6).

322.   The DCFA prohibits the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby.

323.   As described herein, Defendant violated DCFA by engaging in unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce.

324.   By failing to disclose and concealing the defective nature of the gas absorption refrigerators from Plaintiff and Delaware Subclass members, Defendant has engaged in deceptive, unfair, fraudulent, and misleading acts and practices in connection with consumer transactions, as Defendant has represented that its refrigerators had characteristics and benefits that they do not have, and represented that its refrigerators were of a particular standard, quality or grade when they were of a lesser standard, quality, or grade.

325.   Defendant knew that its Defective Gas Absorption Refrigerators and Defective Cooling Units were defectively designed, were at risk of failing prematurely, and were not suitable for their intended use. Defendant also knew that the design defects in its Defective Gas Absorption Refrigerators created and constituted a serious and unreasonable safety and fire hazard.  These risks should have been disclosed instead of concealed so consumers could make an informed purchasing decision. Further, Defendant knew that the design defects and safety hazards in its gas absorption refrigerators could be substantially decreased, if not totally eliminated, by the adoption of alternate designs readily available in the market.

326.   Notwithstanding Defendant's knowledge of the design defects and inherent safety risks in its gas absorption refrigerators, and its knowledge of alternate designs to eliminate the defects and safety hazards, Defendant failed and refused to alter its gas absorption refrigerator design, and instead engaged in a continuous pattern of deception and concealment, designed to mislead Plaintiff and members of the Delaware Subclass into believing that its gas absorption refrigerators were safe, when in fact they were, and continue to be, dangerously defective.   Defendant's records show that leaks and fires continue to occur through the present.

327.   Defendant, at all times up to the filing of this Complaint, has engaged in a pattern of concealment and misrepresentation designed to mislead Plaintiff and members of the Delaware Subclass into believing that the refrigerators they owned were either free of defects, or that any defects had been fully and completely eliminated through Defendant's retrofit campaigns.  As a result of Defendant's concealment and misrepresentation, Plaintiff did not know, and could not through the exercise of reasonable diligence be expected to know, of the defects and safety risks involved in their use of Defendant's products, or of Defendant's fraudulent, unlawful, and unfair conduct, as outlined above.

COMPLAINT                                                                              99

328.   Through the above-described omissions, Defendant has engaged in deceptive and misleading business practices including, but not limited to:

   a.   Misrepresenting by omission that the gas absorption refrigerators at issue have characteristics, uses, benefits, and qualities which they do not have;

   b.   Misrepresenting by omission that the gas absorption refrigerators at issue are of a particular standard, quality, and grade when they are not;

   c.   Misrepresenting by omission that a transaction involving the gas absorption refrigerators at issue confers or involves rights, remedies, and obligations which it does not;

   d.   Misrepresenting by omission that the subject of a transaction involving the gas absorption refrigerators at issue has been supplied in accordance with a previous representation when it has not;

   e.   Failing to disclose the dangerous safety defect inherent in the gas absorption refrigerators at issue when that was a material fact reasonable consumers would want to know about; and

   f.   Failing to promptly notify the Class of the defect and risks, as required by the Safety Act and/or other law.

329.   The above-described deceptive and/or unfair acts were perpetrated by Defendant with the intent for Plaintiff and members of Delaware Subclass to rely on the deception in order maximize revenue. Defendant's conduct offends public policy and caused substantial injury to consumers.

330.   Defendant knew, or should have known, that its omissions of facts concerning safety risks were material to reasonable consumers like those in the Delaware Subclass. Reasonable consumers would expect to be warned by a product's manufacturer of all facts regarding serious and unreasonable dangers, as exist here.   Defendant deliberately withheld information from the Delaware

Subclass that severe fires could result from the use of Defendant's Defective Gas Absorption Refrigerators, which could cause serious bodily harm or death.  Given the severity of the consequences which Defendant failed to disclose, the materiality of such an omission cannot be questioned. The facts concealed or not disclosed by Defendant to Plaintiff and members of the Delaware Subclass are material in that reasonable consumers would have considered them to be important in deciding whether to purchase (or retain) Defendant's Defective Gas Absorption Refrigerators and Defective Cooling Units, or pay a lesser price.  Had Plaintiff and the Delaware Subclass members known of true extent of the defective nature of Defendant's products, they would not have purchased (or retained) the products, or would have paid less for them.

331.  By way of the foregoing, Plaintiff Shoemaker and members of the Delaware Subclass have sustained actual damages as a direct and proximate result of Dometic's unfair, deceptive, and unconscionable practices. Plaintiff and members of the Delaware Subclass would not have purchased a Defective Gas Absorption Refrigerator had they known about the defect, or they would have paid less for a gas absorption refrigerator had they known.

332.  Defendant's conduct has caused Plaintiff Shoemaker and the members of the Delaware Subclass to suffer an ascertainable loss by receiving less than what was promised. Specifically, the dangerous defect inherent in each Defective Gas Absorption Refrigerator renders it valueless to consumers, who paid between $1,400.00-$2,350.00, on average, based on advertised retail prices and/or Defendant's price lists.[13]

333.  Plaintiff also paid a premium for a safe and defect free refrigerator and/or cooling unit. Consumer surveys and analyses can empirically quantify the monetary value of a refrigerator containing the Defect as compared to the safe and

---

[13]  *See, e.g.,* RV Parts Country, Dometic Refrigerators http://www.rvpartscountry.com/DometicRefrigerators (last visited Sept. 11, 2017).

defect free refrigerator that Plaintiff and Delaware Subclass members paid for. Plaintiff and members of the Delaware Subclass would not have paid this quantifiable price premium had they known the true extent of the defective nature of the Defective Gas Absorption Refrigerator.

334.   In addition to the price premium and lost benefit of the bargain, all Plaintiff and Delaware Subclass members will incur additional expenses in the form of repair and replacement costs necessary to remediate the safety risk inherent in each Defective Gas Absorption Refrigerator.

335.   Based on the foregoing, Plaintiff Shoemaker and all Delaware Subclass members are entitled to actual damages, declaratory and injunctive relief, as well as all other relief deemed just and equitable and allowable by law or equity.

### COUNT V
### Violation of the New Jersey Consumer Fraud Act,
### N. J. Stat. Ann. § 56:8-1 *et seq.*
### (on behalf of the New Jersey Subclass)

336.   Plaintiffs incorporate by reference each allegation set forth above.

337.   This cause of action is brought pursuant to the New Jersey Consumer Fraud Act, N. J. Stat. Ann. § 56:8-1 *et seq.* ("NJCFA") because Defendant's actions and conduct described herein constitute transactions that have resulted in the sale of goods merchandise to consumers.

338.   Plaintiff Shoemaker and the members of the New Jersey Subclass are each a "person" as defined by N.J. Stat. Ann. § 56.8-1(c). Defendant is a person as defined by N.J. Stat. Ann. § 56:8-1(d), and the Defective Refrigerators are merchandise as defined by § 56:8-1(c).

339.   The NJCFA prohibits the use or employment of any unconscionable commercial practice, deception, false presents, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the sale of any merchandise. N.J. Stat. Ann. § 56:8-2.

340.   As described herein, Defendant violated NJCFA by engaging unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce.

341.   By failing to disclose and concealing the defective nature of the gas absorption refrigerators from Plaintiff and New Jersey Subclass members, Defendant has engaged in deceptive, unfair, fraudulent, and misleading acts and practices in connection with consumer transactions, as Defendant has represented that its refrigerators had characteristics and benefits that they do not have, and represented that its refrigerators were of a particular standard, quality or grade when they were of a lesser standard, quality, or grade.

342.   Defendant knew that its Defective Gas Absorption Refrigerators and Defective Cooling Units were defectively designed, were at risk of failing prematurely, and were not suitable for their intended use. Defendant also knew that the design defects in its Defective Gas Absorption Refrigerators created and constituted a serious and unreasonable safety and fire hazard.  These risks should have been disclosed instead of concealed so consumers could make an informed purchasing decision. Further, Defendant knew that the design defects and safety hazards in its Defective Gas Absorption Refrigerators could be substantially decreased, if not totally eliminated, by the adoption of alternate designs readily available in the market.

343.   Notwithstanding Defendant's knowledge of the design defects and inherent safety risks in its gas absorption refrigerators, and its knowledge of alternate designs to eliminate the defects and safety hazards, Defendant failed and refused to alter its gas absorption refrigerator design, and instead engaged in a continuous pattern of deception and concealment, designed to mislead Plaintiff and members of the New Jersey Subclass into believing that its gas absorption

refrigerators were safe, when in fact they were, and continue to be, dangerously defective.   Defendant's records show that leaks and fires continue to occur through the present.

344.   Defendant, at all times up to the filing of this Complaint, has engaged in a pattern of concealment and misrepresentation designed to mislead Plaintiff and members of the New Jersey Subclass into believing that the refrigerators they owned were either free of defects, or that any defects had been fully and completely eliminated through Defendant's retrofit campaigns. As a result of Defendant's concealment and misrepresentation, Plaintiff did not know, and could not through the exercise of reasonable diligence be expected to know, of the defects and safety risks involved in their use of Defendant's products, or of Defendant's fraudulent, unlawful and unfair conduct, as outlined above.

345.   Through the above-described omissions, Defendant has engaged in deceptive and misleading business practices including, but not limited to:

     a.  Misrepresenting by omission that the gas absorption refrigerators at issue have characteristics, uses, benefits, and qualities which they do not have;

     b.  Misrepresenting by omission that the gas absorption refrigerators at issue are of a particular standard, quality, and grade when they are not;

     c.  Misrepresenting by omission that a transaction involving the gas absorption refrigerators at issue confers or involves rights, remedies, and obligations which it does not;

     d.  Misrepresenting by omission that the subject of a transaction involving the gas absorption refrigerators at issue has been supplied in accordance with a previous representation when it has not;

e. Failing to disclose the dangerous safety defect inherent in the gas absorption refrigerators at issue when that was a material fact reasonable consumers would want to know about; and

f. Failing to promptly notify the New Jersey Subclass of the defect and risks, as required by the Safety Act.

346. The above-described deceptive and/or unfair acts were perpetrated by Defendant with the intent for Plaintiff and members of New Jersey Subclass to rely on the deception in order maximize revenue. Defendant's conduct offends public policy and caused substantial injury to consumers.

347. Defendant knew, or should have known, that its omissions of facts concerning safety risks were material to reasonable consumers like those in the New Jersey Subclass. Reasonable consumers would expect to be warned by a product's manufacturer of all facts regarding serious and unreasonable dangers, as exist here. Defendant deliberately withheld information from the New Jersey Subclass that severe fires could result from the use of Defendant's Defective Gas Absorption Refrigerators, which could cause serious bodily harm or death. Given the severity of the consequences which Defendant failed to disclose, the materiality of such an omission cannot be questioned. The facts concealed or not disclosed by Defendant to Plaintiff and members of the New Jersey Subclass are material in that reasonable consumers would have considered them to be important in deciding whether to purchase (or retain) Defendant's Defective Gas Absorption Refrigerators and Defective Cooling Units, or pay a lesser price. Had Plaintiff and the New Jersey Subclass members known of true extent of the defective nature of Defendant's products, they would not have purchased (or retained) the products, or would have paid less for them.

348. By way of the foregoing, Plaintiff Shoemaker and members of the New Jersey Subclass have sustained actual damages as a direct and proximate result of Dometic's unfair, deceptive, and unconscionable practices. Plaintiff and

members of the New Jersey Subclass would not have purchased a Defective Gas Absorption Refrigerator had they known about the defect, or they would have paid less for a gas absorption refrigerator had they known.

349.   Defendant's conduct has caused Plaintiff Shoemaker and members of the New Jersey Subclass to suffer an ascertainable loss by receiving less than what was promised. Specifically, the dangerous defect inherent in each Defective Gas Absorption Refrigerator renders it valueless to consumers, who paid between $1,400.00-$2,350.00, on average, based on advertised retail prices and/or Defendant's price lists.[14]

350.   Plaintiff also paid a premium for a safe and defect free refrigerator. Consumer surveys and analyses can empirically quantify the monetary value of a refrigerator containing the Defect as compared to the safe and defect free refrigerator that Plaintiff and New Jersey Subclass members paid for. Plaintiff and members of the New Jersey Subclass would not have paid this quantifiable price premium had they known the true extent of the defective nature of the Defective Gas Absorption Refrigerator.

351.   In addition to the price premium and lost benefit of the bargain, Plaintiff and New Jersey Subclass members will incur additional expenses in the form of repair and replacement costs necessary to remediate the safety risk inherent in each Defective Gas Absorption Refrigerator.

352.   Based on the foregoing, Plaintiff Shoemaker and all New Jersey Subclass members are entitled to actual damages, declaratory and injunctive relief, as well as all other relief deemed just and equitable and allowable by law or equity.

---

[14] *See,   e.g.,*   RV   Parts   Country,   Dometic   Refrigerators http://www.rvpartscountry.com/DometicRefrigerators (last visited Sept. 11, 2017).

## COUNT VI
### Violation of New York General Business Law 349
### (on behalf of the New York Subclass)

353.   Plaintiffs incorporate by reference each allegation set forth above.

354.   This cause of action is brought pursuant to New York General Business Law 349.

355.   Plaintiff Haisch, the members of the New York Subclass, and Defendant are "persons" within the meaning of New York General Business Law 349 ("GBL 349").

356.   GBL 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York.

357.   By failing to disclose and concealing the defective nature of the gas absorption refrigerators from Plaintiff and the New York Subclass members, Defendant has engaged in deceptive, unfair, fraudulent, and misleading acts and practices in connection with consumer transactions, as Defendant has represented that its refrigerators had characteristics and benefits that they do not have, and represented that its refrigerators were of a particular standard, quality or grade when they were of a lesser standard, quality, or grade.

358.   Defendant knew that its Defective Gas Absorption Refrigerators and Defective Cooling Units were defectively designed, were at risk of failing prematurely, and were not suitable for their intended use. Defendant also knew that the design defects in its Defective Gas Absorption Refrigerators created and constituted a serious and unreasonable safety and fire hazard.  These risks should have been disclosed instead of concealed so consumers could make an informed purchasing decision. Further, Defendant knew that the design defects and safety hazards in its Defective Gas Absorption Refrigerators could be substantially decreased, if not totally eliminated, by the adoption of alternate designs readily available in the market.

COMPLAINT                                                                                          107

359.   Notwithstanding Defendant's knowledge of the design defects and inherent safety risks in its Defective Gas Absorption Refrigerators, and its knowledge of alternate designs to eliminate the defects and safety hazards, Defendant failed and refused to alter its gas absorption refrigerator design, and instead engaged in a continuous pattern of deception and concealment, designed to mislead Plaintiff and members of the New York Subclass into believing that its gas absorption refrigerators were safe, when in fact they were, and continue to be, dangerously defective.  Defendant's records show that leaks and fires continue to occur through the present.

360.   Defendant, at all times up to the filing of this Complaint, has engaged in a pattern of concealment and misrepresentation designed to mislead Plaintiff and members of the New York Subclass into believing that the refrigerators they owned were either free of defects, or that any defects had been fully and completely eliminated through Defendant's retrofit campaigns. As a result of Defendant's concealment and misrepresentation, Plaintiff did not know, and could not through the exercise of reasonable diligence be expected to know, of the defects and safety risks involved in their use of Defendant's products, or of Defendant's fraudulent, unlawful, and unfair conduct, as outlined above.

361.   Through the above-described omissions, Defendant has engaged in deceptive and misleading business practices including, but not limited to:

    a.   Misrepresenting by omission that the gas absorption refrigerators at issue have characteristics, uses, benefits, and qualities which they do not have;

    b.   Misrepresenting by omission that the gas absorption refrigerators at issue are of a particular standard, quality, and grade when they are not;

c. Misrepresenting by omission that a transaction involving the gas absorption refrigerators at issue confers or involves rights, remedies, and obligations which it does not;

d. Misrepresenting by omission that the subject of a transaction involving the gas absorption refrigerators at issue has been supplied in accordance with a previous representation when it has not;

e. Failing to disclose the dangerous safety defect inherent in the gas absorption refrigerators at issue when that was a material fact reasonable consumers would want to know about; and

f. Failing to promptly notify the Class of the defect and risks, as required by the Safety Act and/or other law.

362. The above-described deceptive and/or unfair acts were perpetrated by Defendant with the intent for Plaintiff and members of New York Subclass to rely on the deception in order maximize revenue in violation of GBL 349. Defendant's conduct offends public policy and caused substantial injury to consumers.

363. Defendant knew, or should have known, that its omissions of facts safety risks were material to reasonable consumers like those in the New York Subclass. Reasonable consumers would expect to be warned by a product's manufacturer of all facts regarding serious and unreasonable dangers, as exist here. Defendant deliberately withheld information from the New York Subclass that severe fires could result from the use of Defendant's gas absorption refrigerators, which could cause serious bodily harm or death. Given the severity of the consequences which Defendant failed to disclose, the materiality of such an omission cannot be questioned. The facts concealed or not disclosed by Defendant to Plaintiff and members of the New York Subclass are material in that reasonable consumers would have considered them to be important in deciding whether to purchase (or retain) Defendant's Defective Gas Absorption Refrigerators and Defective Cooling Units, or pay a lesser price. Had Plaintiff and the New York

Subclass members known of true extent of the defective nature of Defendant's products, they would not have purchased (or retained) the products, or would have paid less for them.

364.   By way of the foregoing, Plaintiff Haisch and members of the New York Subclass have sustained actual damages as a direct and proximate result of Dometic's unfair, deceptive, and unconscionable practices. Plaintiff and members of the New York Subclass would not have purchased a Defective Gas Absorption Refrigerator had they known about the defect, or they would have paid less for a gas absorption refrigerator had they known.

365.   Defendant's conduct has caused Haisch and members of the New York Subclass to suffer an ascertainable loss by receiving less than what was promised. Specifically, the dangerous defect inherent in each Defective Gas Absorption Refrigerator renders it valueless to consumers, who paid between $1,400.00-$2,350.00, on average, based on advertised retail prices and/or Defendant's price lists.[15]

366.   Plaintiff also paid a premium for a safe and defect free refrigerator. Consumer surveys and analyses can empirically quantify the monetary value of a refrigerator containing the Defect as compared to the safe and defect free refrigerator that Plaintiff and New York Subclass members paid for. Plaintiff and members of the New York Subclass would not have paid this quantifiable price premium had they known the true extent of the defective nature of the Defective Gas Absorption Refrigerator.

367.   In addition to the price premium and lost benefit of the bargain, Plaintiff and New York Subclass members will incur additional expenses in the form of repair and replacement costs necessary to remediate the safety risk inherent in each Defective Gas Absorption Refrigerator.

---

[15] *See,    e.g.*,    RV    Parts    Country,    Dometic    Refrigerators http://www.rvpartscountry.com/DometicRefrigerators (last visited Sept. 11, 2017).

368.   Based on the foregoing, Plaintiff Haisch and all New York Subclass members are entitled to actual damages, declaratory and injunctive relief, as well as all other relief deemed just and equitable and allowable by law or equity.

### COUNT VII
### Breach of Implied Warranty
### (on behalf of each State Subclass and/or the Class)

369.   Plaintiffs incorporate by reference each allegation set forth above.

370.   The state statutes in the relevant states are modeled after the Uniform Commercial Code § 2-314 and are materially identical. Compare: Ariz. Rev. Stat. § 47-2314; Cal. Com. Code § 2314 and Cal. Civ. Code § 1790; Ark. Code. § 4-2-314; Tex. Bus. & Com. Code § 2.314; N.Y. U.C.C. Law 2-314; N.J. Stat. § 12A:2-314; Del. Code Ann. tit. 6 § 2-314; Va. Code Ann. § 8.2-314; and La. Civ. Code Ann. arts. 2520.[16] Plaintiffs therefore bring claims pursuant to the relevant state statutes on behalf of their respective state Subclass.

371.   Plaintiffs Zimmer, Rich, and Arnold bring claims pursuant to Cal. Com. Code § 2314 and Cal. Civ. Code § 1790 *et seq.* on behalf of themselves and the California Subclass.

372.   Plaintiff Mitchell brings claims pursuant to Ariz. Rev. Stat. § 47-2314 on behalf of himself and the Arizona Subclass.

373.   Plaintiff Jackson brings claims pursuant to Ark. Code. § 4-2-314 on behalf of himself and the Arkansas Subclass.

374.   Plaintiffs Horner and Greene bring claims pursuant to Tex. Bus. & Com. Code § 2.314 on behalf of themselves and the Texas Subclass.

375.   Plaintiff Haisch brings claims pursuant to N.Y. U.C.C. Law 2-314 on behalf of himself and the New York Subclass.

---

[16] Plaintiffs concede that the Louisiana Civil Code is not modeled after the Uniform Commercial Code but nonetheless allege that the factual allegations contained herein similarly satisfy a claim for rehibition.

376.   Plaintiff Shoemaker brings claims pursuant to N.J. Stat. § 12A:2-314 on behalf of himself and the New Jersey Subclass.

377.   Plaintiff Shoemaker brings claims pursuant to Del. Code Ann. tit. 6 § 2-314 on behalf of himself and the Delaware Subclass.

378.   Plaintiff Sadler brings claims pursuant to Va. Code Ann. § 8.2-314 on behalf of herself and the Virginia Subclass.

379.   Plaintiff Ortego brings claims pursuant to La. Civ. Code Ann. arts. 2520 on behalf of himself and the Louisiana Subclass.

380.   Dometic was at all relevant times a merchant with respect to the Defective Gas Absorption Refrigerators and Defective Cooling Units at issue in this Complaint.

381.   Dometic's contracts with RV manufacturers include an implied warranty that its Defective Gas Absorption Refrigerators installed with a Defective Cooling Unit are merchantable in that they are, *inter alia*, fit for the ordinary purposes for which such goods are used.

382.   The Defective Gas Absorption Refrigerators and Defective Cooling Unit in the refrigerators are not in a merchantable condition or fit for the ordinary purpose for which such goods are used. The Defective Cooling Unit contains design and manufacturing defects that may cause the cooling unit's boiler tube to corrode and crack, which releases flammable and explosive gases, causing the risk of fire and explosion resulting in property damage, personal injury, and/or death.

383.   At all times relevant, Dometic was aware of the defect in its Defective Gas Absorption Refrigerators and Defective Cooling Units.

384.   Plaintiffs, the Class, and all members of the Subclasses were intended third-party beneficiaries of the contracts between Dometic and the manufacturers of Plaintiffs' and the Subclass/Class members' RVs. At the time Dometic marketed and otherwise placed its Defective Gas Absorption Refrigerators with the Defective Cooling Unit into the stream of commerce, it knew that the OEM's

would install the refrigerators into recreational vehicles. Consumers such as Plaintiffs and members of the Class were the intended and foreseeable users of the Defective Gas Absorption Refrigerators and Defective Cooling Units.

385.   Dometic made implied warranties as to the merchantability and fitness of its Defective Gas Absorption Refrigerators and Defective Cooling Units when it contracted with manufacturers for sale of gas absorption refrigerators and when it recalled and/or installed a recall kit on specific models of its refrigerators. At both times Dometic impliedly warranted that the gas absorption refrigerators were of merchantable quality and fit for such use, did not contain dangerous defects, and were not susceptible to causing fires.

386.   Dometic continues to conceal the inherent safety defect in its Defective Gas Absorption Refrigerators and Defective Cooling Units and represents and sells the same as safe and fit for the ordinary purposes for which they are used. Yet, as demonstrated by recent, post-recall fires, regardless of any recalls, retrofits, or replacements, the Defective Gas Absorption Refrigerators are still dangerous, cause fires, and increase the risk of fire or explosion.

387.   As a direct and proximate result of Dometic's breach of warranty, Plaintiffs, the Class, and members of the Subclasses have suffered and will continue to suffer damage, loss, and injury in an amount to be established at trial.

388.   Plaintiffs and members of the Class and Subclasses are entitled to legal and equitable relief against Dometic, including actual and consequential damages, rescission, attorneys' fees, costs, as well as all other relief deemed just and equitable and allowable by law or equity.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs on behalf of themselves and all other similarly situated individuals in the Class and all Subclasses, demand judgment against Defendant as follows:

COMPLAINT                                                                                                 113

A.       Granting class certification and appointing Plaintiffs as Class representatives and the undersigned counsel as Class Counsel;

B.       Enjoining Defendant from the continued sale of the Defective Gas Absorption Refrigerators;

C.       Awarding Plaintiffs and the Class all damages and relief that may be allowed under applicable law;

D.       Awarding Plaintiffs and the Class appropriate injunctive relief and declaratory relief;

E.       Awarding appropriate restitution;

F.       Awarding Plaintiffs and the Class all costs and disbursements and reasonable attorneys' fees;

G.       For an injunction ordering Defendant to actually repair or replace the Defective Gas Absorption Refrigerators and/or Defective Cooling Units;

H.       For an injunction ordering Defendant to provide corrective notice to the Class; and

I.       All other relief that the court deems just and equitable in the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.


Respectfully submitted,

**ZIMMERMAN REED LLP**


Dated:  September 19, 2017          By: /s/ Caleb Marker
                                    Caleb Marker (CA SBN 269721)
                                    2381 Rosecrans Avenue, Suite 328
                                    Manhattan Beach, California 90245
                                    Telephone: (877) 500-8780
                                    Facsimile:  (877) 500-8781
                                    Email: caleb.marker@zimmreed.com

Hart L. Robinovitch (Pending PHV)
14646 North Kierland Blvd., Suite 145
Scottsdale, Arizona  85254
Telephone: (480) 348-6400
Facsimile:  (480) 348-6415
Email: hart.robinovitch@zimmreed.com

*Attorneys for Plaintiffs and the Class*

COMPLAINT                                                                                                    115